[Crim. No. 10188. Third Dist. May 29, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY G. JOHNSON, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Ruth L. Young, Chief Assistant State Public Defender, and Marc E. Cutler, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Joel Carey and J. Robert Jibson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**REYNOSO, J.**—Defendant Larry G. Johnson appeals from a judgment (order of probation) entered by the Superior Court of Sacramento County after a jury found him guilty of one count of rape. (Pen. Code, § 261, subd. 2.) Defendant contends: (1) he was denied a fair trial because some members of the jury observed him stopped by the police on a traffic matter after the evening recess on the day before deliberations; (2) the prosecutor committed misconduct in questioning a defense witness; and (3) the trial court erred in instructing pursuant to CALJIC No. 2.62, which permits the jury to draw an adverse inference from a defendant's failure to explain or deny aspects of the prosecution's evidence when he testifies.

We hold that the prosecutor committed misconduct during argument to the jury which, in light of the whole record, was prejudicial to defendant. Accordingly, we reverse the judgment.

I

On the evening of March 4, 1978, defendant went to the home of 22-year-old Dyana J. Dyana was acquainted with defendant because he was her former boyfriend's best friend. Defendant asked Dyana to go to

a party with him and she agreed to go for a ride. Defendant and Dyana took her baby to a friend's house for babysitting and then went to a liquor store. From the liquor store they went to the Kitten Club, and from there to the Getaway Club. From the Getaway Club defendant and Dyana went to a bar on Rio Linda Boulevard called Mitch's. While at Mitch's they met defendant's cousin, Wilma Henderson.

Defendant and Dyana left Mitch's and went to Wilma's house in Del Paso Heights. They went into a bedroom and sat on the bed to talk. Wilma and her boyfriend, Ray Hamilton, came home and Ray asked them to act respectfully as there were children in the house. Defendant and Dyana went back to Mitch's, and finally to the apartment of defendant's sister, Linda Jones. By this time it was quite early in the morning and Linda's boyfriend, Michael Finley, let them in and went back to bed.

While there was no dispute as to the events of the evening up to this point, the testimony was in conflict as to what happened next. Dyana testified that defendant said he was drunk and wanted to "get it together" before driving her home. They went into the apartment and began watching television. Dyana asked to be taken home and defendant refused. She started for the door but defendant grabbed her shoe and tripped her, and then climbed on top of her. Defendant said he wanted to have sex with her, and when she refused he said she was going to anyway. He forcibly removed her pants, and slapped her to make her remove her blouse. He then accomplished an act of sexual intercourse against her will, while she tried to scratch him.

After a while, and before he climaxed, defendant stopped and let Dyana get up to go to the bathroom. She tried to climb out of the bathroom window but could not open it, so she returned to the living room. Defendant was in the kitchen, so Dyana put a sheet around herself and ran from the apartment. She waited until defendant drove away and then returned to the apartment for her clothing. She was admitted by Linda Jones, dressed herself, and then went to a Shortstop market and called the police.

Defendant's version of the events differed. He testified that his cousin, Wilma, had given him permission to take Dyana to her house and that they went there for the purpose of having sex. Without any specifically articulable reason defendant believed that Dyana was aware that he intended to have a sexual interlude, and that she was agreeable.

When Ray Hamilton told them to leave they went to Linda Jones' apartment for the purpose of having sex. They sat on the couch for a time and then just rolled onto the floor and performed an act of consensual intercourse. Dyana did not resist and did not tell defendant to stop. Defendant did not hit or slap her, or otherwise force her to have intercourse.

When Dyana returned from the bathroom she asked defendant to take her home, but he was tired and told her to wait. She grabbed a sheet and left. Defendant said "You crazy," but she kept walking so he laid back down. He thought she was "tripping or something," since she had been using drugs.

A police officer who responded to Dyana's call met her about 6:15 a.m., and observed that she was emotionally upset and appeared to have some bruising marks. Dyana was taken to an emergency medical facility for examination and treatment. The examining physician observed petechial areas, that is, something like bruising on her right neck, right shoulder, the left part of her upper back, on both arms, and the back of her right hand. She also had superficial abrasions on her lower abdomen. A pelvic examination revealed nothing significant. No seminal fluid or spermatazoa were found within her vagina.

Linda Jones confirmed that she had answered Dyana's knock in the early morning hours of March 5th, and that Dyana had been wrapped in a wet yellow sheet. She confirmed that Dyana's clothing had been inside her apartment, but denied that Dyana said she had been raped. Michael Finley confirmed that he let defendant and Dyana into the apartment when they arrived. He said that he had gone back to bed and heard nothing more, but admitted that he may have told officers that he heard someone say "Leave me alone." A police officer testified that Finley had told him that he heard Dyana say "Leave me alone," but there was no yelling and that he heard no scuffling or fighting. Both Jones and Finley testified that there was nothing wrong with their bathroom window and that it could be opened. The police officer who arrested defendant on the morning of March 5th testified that he examined defendant's body for cuts or scratches but found none.

In an effort to impeach Dyana's credibility the defense introduced the testimony of Terry Osborne, her former boyfriend and a friend of defendant. He testified that after defendant had been arrested Dyana asked him to relay a message to defendant that she would drop the

charges if defendant would turn over his car and his bank account to her; that was what she wanted in the first place.

Based upon the totality of the above summarized evidence the jury found defendant to be guilty of rape. (Pen. Code, § 261, subd. 2.)

## II

As we noted above, Terry Osborne testified that Dyana told him to relay a message to defendant that she would drop the charges in return for his car and bank account. Osborne testified that she told him this "face-to-face" and later called on the telephone to inquire whether the message had been relayed. This testimony was repeated on cross-examination. The following exchange with the prosecutor then took place:

"Q. Now, do you remember being called by me sometime last month?

"A. Yes.

"Q. About the middle of May?

"A. (Witness nods head affirmatively.)

"Q. Do you remember you and I having a discussion about attempted extortion by Mrs. J.?

"A. (Witness nods head affirmatively.)

"Q. And do you remember telling me that you talked to her but one time about that?

"A. No, I don't remember telling you that.

"Q. Do you remember telling me that the only conversation you had about that with her was that—when she made the telephone call to you a day or two after the occurrence?

"A. No, I don't remember telling you that either.

"Q. Well, you never mentioned to me any discussion you had with her personally, did you, when we talked on the phone?

"A. Yes, I did, because you asked me—you quoted the same words that I just said to you, and you asked me, did she say those words, and I told you yes, she did.

"Q. And didn't you tell me that that telephone call was the only time you talked to her about this?

"A. On the telephone."

■ It is settled that a witness may be impeached by evidence of a prior inconsistent statement either on cross-examination or by introduction of extrinsic evidence of the prior inconsistent statement. (Evid. Code, §§ 769, 770, 780, subd. (h), 1235.) It was thus proper to ask the witness whether he had made prior inconsistent statements. Moreover, impeachment by means of prior inconsistent statements made to the prosecuting attorney has been permitted in California. (See *People v. Morgan* (1978) 87 Cal.App.3d 59, 70-71 [150 Cal.Rptr. 712]; *People v. Dontanville* (1970) 10 Cal.App.3d 783, 794 [89 Cal.Rptr. 172].) Such a procedure, however, is fraught with danger.

In *People v. Guerrero* (1975) 47 Cal.App.3d 441 [120 Cal.Rptr. 732], the prosecutor testified in order to impeach a witness with prior inconsistent statements which had been made to him. The Court of Appeal held such a procedure to be impermissible. (47 Cal.App.3d at p. 444.) While it is proper for a prosecuting attorney to interview witnesses in preparation for trial, precautions should be taken to avoid creating a situation in which the prosecutor could become a potential witness. (*Id.*, at p. 448.) In the present case the prosecutor did not become a witness; however, he brought out evidence that he had personally investigated the allegations of extortion by the crucial prosecution witness. While this evidence may have itself been innocuous, it set the stage for argument to the jury in which the prosecutor committed misconduct which must be considered prejudicial in light of this testimony.

In arguing to the jury the prosecutor stated: "Okay. I'm not—you know, you've also, of course, got the defendant. Before I go to the defendant, I'd like to talk about Terry Osborne. Terry Osborne, of course, claimed that this was an extortion attempt.

"Now, defense counsel knew what defense she was going to put on, obviously. I assume so, anyway. She, you know, she never asked Mrs.

[J] any questions about any extortion, any attempt to get money, you see. She just left that out. And I'm sure she is going to say to you, why didn't he bring her back to deny that, if it wasn't true.

"Okay. You see, she had the opportunity to ask her, she never even bothered to ask her about that, to get her statement, and then we've got Terry Osborne. I had talked to him, as you well know, he's testified to that, that we discussed it. Whether you believe what he said on the stand is entirely up to you. Suppose you did believe it. Wouldn't it again appear to be more—and unfortunately I shouldn't be talking about this, because I think I'm dignifying what to me is an outright lie."

In later argument the prosecutor again discussed the Osborne testimony and stated: "Well, I'm not going to, as I say, bothers me to bring this up, because it tends to dignify the fact that you may think that there is some truth toward his statement. I'm not going to bring Mrs. [J] all the way here just to say, did you say that, and have her say no."

■ While in some circumstances it is proper for a prosecutor to comment upon a defendant's failure to ask certain questions of a witness, it is not permissible for a prosecutor to state what the answer to a question would be if it had been asked. (See *People v. Wolfe* (1954) 42 Cal.2d 663, 669 [268 P.2d 475]; *People v. Smith* (1898) 121 Cal. 355, 361 [53 P.802]; *People v. Piazza* (1927) 84 Cal.App. 58, 83 [257 P. 592].) Here, although there was no evidence in the record to indicate that Dyana would deny making the extortion demand, the prosecutor told the jury that she would deny having done so. That this argument was prosecutorial misconduct cannot be denied.

■ In addition to telling the jury that Dyana would deny the extortion demand, the prosecutor told the jury that he personally believed the defense witness to be telling an "outright lie." It is misconduct for a prosecutor to express a personal belief in the merits of a case, rather than a belief based upon the evidence at trial. (See *People v. Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564]; *People v. Alverson* (1964) 60 Cal.2d 803, 808 [36 Cal.Rptr. 479, 388 P.2d 711]; *People v. Kirkes* (1952) 39 Cal.2d 719, 723 [249 P.2d 1].) While in another case a similar argument might be considered to be based upon the prosecutor's interpretation of the evidence, in this case it was not. Before he termed the testimony an outright lie the prosecutor reminded the jury that he had personally investigated the matter, and strength-

ened the implication of personal belief with the statement that "to me" the testimony is an outright lie.

There was no direct evidence in the record to indicate that Osborne's testimony was an outright lie. While the prosecutor could properly urge the jury to reject the testimony in view of the witness's bias, his prior inconsistent statements, and its incongruity with the prosecution evidence, the bald statement that to him it was an outright lie, in the face of a paucity of direct evidence on the issue, implied to the jury that the prosecutor had personal knowledge of facts which were not available to it. This implication was made manifest by the prosecutor's reminder that he had personally investigated the allegations. "Statements of supposed facts not in evidence, either because never offered, or offered and excluded or stricken, or admitted for a limited purpose outside the scope of the comment, are a highly prejudicial form of misconduct, and a frequent basis for reversal. The effect of such remarks is to lead the jury to believe that the district attorney, a sworn officer of the court, has information which the defendant insists on withholding; or that they may consider matters which could not properly be introduced in evidence." (Witkin, Cal. Criminal Procedure (1963) § 450, pp. 453-454. See also *People* v. *Mendoza* (1974) 37 Cal.App.3d 717, 726 [112 Cal. Rptr. 565]; *People* v. *Williams* (1971) 22 Cal.App.3d 34, 48-49 [99 Cal.Rptr. 103]; *People* v. *Hale* (1947) 82 Cal.App.2d 827, 833 [187 P.2d 121].)

The People correctly point out, however, that defendant failed to object at trial to the instances of misconduct. ■ Where a defendant objects to prosecutorial misconduct for the first time on appeal an appellate court must inquire whether a timely objection and admonition would have cured the harm; if so the contention must be rejected. (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) It is only where objection and admonition would not have cured the harm that the court should examine the whole record to determine whether the harm resulted in a miscarriage of justice. (*Ibid.*)

We conclude that a timely objection, and admonition, would not have cured the harm. As we have noted, the prosecutrix did not deny making the extortion demand, and there was no direct evidence whatsoever that she had not made the demand. The prosecutor, in his argument, informed the jury that Dyana denied making the demand, and that he had concluded from his personal investigation that the testimony was an outright lie, thus providing the absent direct evidence. While judicial

admonition may have lessened the impact of such argument, we cannot conceive of an admonition that would have unrung this particular bell. We thus consider whether the argument was prejudicial to defendant.

■ In *People* v. *Bolton* (1979) 23 Cal.3d 208, at pages 214 and 215 [152 Cal.Rptr. 141, 589 P.2d 396], the Supreme Court stated that where prosecutorial misconduct involves federal constitutional error the state must prove beyond a reasonable doubt that the error did not contribute to the result obtained. In a footnote the court noted that a prosecutor, through argument, may serve as his own unsworn witness, thus violating the defendant's Sixth Amendment right to confrontation of witnesses. (See 23 Cal.3d at pp. 214-215, fn. 4.) The prosecutor's argument in this case rose to such a level. Not only did he inform the jury that he had concluded the allegation was false, he told the jury that the prosecutrix denied making the extortion demand. If the prosecutor desired to place a denial before the jury he should have called the witness in rebuttal where her denial would have been under oath and she would have been subject to cross-examination on the issue. By not doing so and instead telling the jury that she would deny the accusation the prosecutor violated defendant's right of confrontation.

■ Review of the record fails to convince us that the misconduct did not contribute to the verdict. Defendant's sister testified that Dyana in fact returned to the apartment wrapped in a sheet after defendant left on the morning of the alleged rape. Dyana asked for her clothing which was inside the apartment, and then dressed and left. She called the police shortly thereafter and reported that she had been raped. When the police arrived Dyana was very emotional, and the button had been torn from her pants. A medical examination disclosed superficial injuries consistent with the application of force. Michael Finley told police investigators that he heard Dyana say "Leave me alone" on the night in question.

The above evidence supported Dyana's testimony. However, there was evidence which supported defendant's claim of consensual intercourse. Defendant and Dyana were together in various bars throughout the evening and Dyana exhibited no signs of distress. They went to defendant's cousin's house and were observed together on a bed in the bedroom. When Finley told the police that he heard Dyana say "Leave me alone," he also told them that she did not yell, and that he heard no sounds of a struggle. Defendant's sister testified that when Dyana returned to the apartment she asked "Is Larry here?" and that her

clothing was neatly folded on the couch in a manner inconsistent with it having been forcibly removed during a rape. Defendant testified that Dyana had been smoking what she called "angel dust" during the evening, and that he thought she was "tripping" when she left the apartment. He drove around the neighborhood looking for her after she left. Dyana's pelvic examination on the morning after the alleged rape disclosed nothing significant.

In most sex offense cases the alleged perpetrator and the alleged victim are the sole or principal witnesses and in such cases there is grave danger that prosecutorial misconduct may tip the scales of justice. (*People* v. *Bain, supra*, 5 Cal.3d at p. 849.) This was such a case. The evidence introduced other than the testimony of the alleged victim and the defendant was of slight value and the jury's verdict ultimately depended upon whether it believed defendant or Dyana. The undenied testimony that Dyana had offered to drop the charges in return for defendant's car and bank account would tend to discredit Dyana, yet the prosecutor improperly informed the jury that Dyana denied the allegation and that he had concluded that it was an outright lie. This argument not only tended to rehabilitate Dyana's testimony, it could imply to the jury that defendant was willing to either suborn perjury or to at least accept the benefits of false testimony. When considered in light of the whole record, it cannot be said that the misconduct was harmless. For this reason the judgment must be reversed.

In view of our conclusion that the judgment must be reversed it is unnecessary to consider defendant's other contentions.

The judgment (order of probation) is reversed.

Puglia, P. J., and Carr, J., concurred.