Filed 4/24/13  P. v. Motuga CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046239 |
| v. | (Super. Ct. No. 09CF0420) |
| CHRIS MOTUGA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Lance Jensen, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Chris Motuga of all four counts of which he was accused in the operative information: (1) continuous sexual abuse of a child under the age of 14 (Pen. Code, § 288.5, subd. (a));[1] (2) lewd act on a child under the age of 14 (§ 288, subd. (a)); (3) lewd act on a child who was 14 or 15 years old and at least 10 years younger than defendant (§ 288, subd. (c)(1)); and (4) assault with the intent to commit oral copulation (§ 220). The jury also found multiple victim allegations to be true pursuant to the "One Strike" law (§ 667.61, subds. (b), (e)(4); see Stats. 2006, ch. 337, § 33, pp. 2163-2165 [version of statute apparently utilized by court in citing § 667.61, subd. (e)(5) for multiple victim enhancement]), as count 1 pertained to victim No. 1 and count 2 pertained to victim No. 2. The court sentenced defendant to a total prison term of 34 years to life. Although we affirm the judgment of conviction, we reverse the judgment with regard to defendant's sentence and remand for resentencing.

FACTS

Defendant was the longtime boyfriend/husband of a woman named M., who is victim No. 1's mother and victim No. 2's aunt. With regard to the conduct at issue, we will separately describe the testimony of victim No. 1 and victim No. 2.[2] Defendant did not testify.

---

[1] All statutory references are to the Penal Code.

[2] The other prosecution witnesses testified, for the most part, about the out-of-court statements of victim No. 1 and victim No. 2. Given the issues raised on appeal, there is no need to explore in detail various consistencies and inconsistencies in the victims' statements, as the jury obviously believed the gist of the victims' testimony.

*Victim No. 2*

Victim No. 2 was born in 1985. In the summer of 1999, at a family event, defendant walked next to victim No. 2 and "grabbed [her] butt." Victim No. 2 characterized the touching as a "pinch." Defendant did not say anything or do anything after the pinch. Victim No. 2 was still 13 years old at the time of this incident.

Just before her 14th birthday, victim No. 2's guardians took a vacation. M. and defendant moved into the home in which victim No. 2 was living. Once defendant moved into victim No. 2's residence, defendant started touching victim No. 2 on multiple occasions.[3] Using his hands, defendant touched victim No. 2's breasts, vagina, and butt. Victim No. 2 did not know how many times this happened, but she agreed it occurred regularly. Victim No. 2's clothes were on when the touching occurred. Defendant would sometimes initiate the contact by asking victim No. 2 to retrieve an item from somewhere in the residence, whereupon he would follow her and touch her.

On one occasion, defendant asked victim No. 2 to retrieve an item from defendant's room. After she entered the room, defendant followed victim No. 2 inside "and closed the door . . . and locked it and pushed [her] on to the bed and tried to get [her] to have sex with him." Defendant was on top of victim No. 2 and tried to take her pants off. Defendant kissed victim No. 2. M. returned home at this point and defendant stopped his conduct. Victim No. 2 did not tell M. about what had happened because M. "said she was happy with him, she was finally happy and I didn't want to ruin that for her."

---

[3] Victim No. 2's trial testimony did not provide a precise date for the arrival of defendant at her residence. In an interview with police conducted in July 2002, victim No. 2 provided information to the officer suggesting the move-in date was November 29, 1999. In her July 2002 police interview, victim No. 2 stated that the first incident occurred in mid-December 1999. In a separate interview with a social worker in August 2002, Victim No. 2 indicated there had been a single incident before November 2009 in which defendant brushed her butt with his hand.

Victim No. 2 testified about another incident: "It was like the same thing — told me to go look for something. I went down the hallway and then I got there and he was kissing me and trying to get me to go down there to give him oral sex." Victim No. 2 did not perform oral sex.

M. and defendant moved out of victim No. 2's residence in the spring of 2000. After defendant had moved out, he continued to touch victim No. 2 at family events.

Defendant told victim No. 2 that she "better not tell anybody." Victim No. 2 did not tell an adult, but she told two of her female cousins about what happened. In July 2002, victim No. 2's biological father asked her if defendant had "done these things" to her.[4] Victim No. 2 told her biological father it was true, and her father confronted and beat up defendant.

Victim No. 2 talked to the police soon after she had talked to her biological father in 2002, when victim No. 2 was 17 years old. Victim No. 2 also spoke with the police in 2009.

Defendant never had sexual intercourse or oral sex with victim No. 2. Neither defendant nor victim No. 2 ever masturbated the other.

*Victim No. 1*

Victim No. 1 was born in 1993 and was 17 years old at the time of trial. During victim No. 1's childhood, defendant was physically violent toward M. and M.'s children. When victim No. 1 reached the age of 12, defendant began touching victim No. 1 inappropriately. Defendant touched victim No. 1's breasts, vagina, and butt. Defendant used his hands; victim No. 1 had her clothes on. The touching stopped when

---

[4] Victim No. 2's sister had told their father about what Victim No. 2 had told her on a prior occasion.

victim No. 1 reached the age of 14 or 15. While it continued, defendant touched victim No. 1 every day or every other day.

Victim No. 1 recalled the circumstances of the first time defendant touched her in a sexual manner: "Well, we were moving. We got kicked out of my apartment. That's when we were moving into the motel and so we had to pack all our stuff. That's when he started. He would grab me and he would just like pull me onto him and hold me close to him real tight or he would grab my butt and squeeze it and stuff like that."

When they lived at a motel, "he would touch me, like my breast a lot, or he would rub up against me, if I was sitting on the bed with him[]. Or, when I was sick one time, he slipped his hand down my pants." Defendant convinced victim No. 1 to let him massage her stomach because she was sick, but defendant subsequently put his hands inside her pants by her vagina.

Another time, victim No. 1 was walking toward the door when defendant "grabbed me from behind and pulled me on the bed and then he was rubbing against me." Defendant was on top of victim No. 1, who was on her back on the bed. "He had his arms wrapped around me and his legs were wrapped around me . . . ." Defendant was rubbing his crotch against victim No. 1's body. On another occasion when defendant was driving a car with victim No. 1 in the passenger seat, defendant parked the car and began kissing victim No. 1 on the mouth.

Victim No. 1 eventually told her mother, M., about what had happened. She did not tell anyone right away because no one believed victim No. 2 when she made her allegations against defendant. Defendant never had sexual intercourse or oral sex with victim No. 1.

DISCUSSION

*Sufficiency of the Evidence With Regard to Count 4*

Defendant first asserts there was insufficient evidence presented at trial to support his conviction on count 4, assault with the intent to commit oral sex (§ 220). Subsequently amended on several occasions, the applicable version of section 220 states that "[e]very person who assaults another with intent to commit . . . oral copulation . . . is punishable by imprisonment in the state prison for two, four, or six years." (Stats. 1979, ch. 944, § 3, p. 3253.)

Count 4 refers to the incident in which defendant isolated victim No. 2 in their shared residence in late 1999 or early 2000, then (as related by victim No. 2 at trial) kissed her and tried to "get [her] to go down there to give him oral sex." The police officer who interviewed victim No. 2 in 2002 testified that victim No. 2 told him about a specific incident in which defendant "attempted to have her give him oral sex."[5] There is clearly substantial evidence supporting the finding that an incident occurred. But, as set forth in CALCRIM No. 890, the elements of the offense include the application or attempted application of force, as well as an applicable mental state, i.e., "[w]hen the defendant acted, he intended to commit oral copulation." There is no further elaboration in the record as to why it was apparent to victim No. 2 that defendant was attempting/intending to force her to orally copulate him. Defendant argues on appeal that the evidence is insufficient to allow a finding of guilt on this count.

---

[5] Testimony by a different officer at the preliminary hearing was more explicit. This officer interviewed both victims in 2009. In her 2009 interview, victim No. 2 "recalled an incident where [defendant] took his pants down, exposed his penis, and told her he wanted her to perform oral copulation." "As he did so, he grabbed her and held her and [told her], 'you're going to suck my dick.'" These details were not introduced into evidence at trial.

6

A reviewing court should not "'"ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation omitted.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) Substantial evidence is evidence that is "reasonable, credible, and of solid value . . . ." (*Id.* at p. 578.) Reasonable inferences may be made from substantial evidence. But inferences "'"may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work."'" (*People v. Raley* (1992) 2 Cal.4th 870, 891.)

To constitute substantial evidence of a *particular* sex crime, testimony "must describe the *kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy)." (*People v. Jones* (1990) 51 Cal.3d 294, 316; see also *People v. Raley*, *supra*, 2 Cal.4th at pp. 890-891 [although there was clear evidence of a forcible sexual attack of some unspecified kind on a murder victim, her denial in the ambulance that she had been raped and statement about "'fool[ing] around'" was not sufficient to prove specific crime of forcible oral copulation].)

There is substantial evidence supporting the conviction on count 4. By stating that defendant tried to "get [her] to go down there to give him oral sex," Victim No. 2 provided sufficient evidence for the jury to conclude that defendant was (along with kissing victim No. 2) in some way trying to force victim No. 2 to put her mouth on defendant's sexual organ (§ 288a). This is not a case in which the only evidence is the victim's "subjective evaluation" of the defendant's intent in an ambiguous scenario. (See *People v. Greene* (1973) 34 Cal.App.3d 622, 651.) A reasonable jury could infer victim No. 2 was characterizing defendant's actions, not speculating as to his intent.

7

*Prosecutorial Misconduct in Closing Argument*

Defendant also claims the prosecutor committed misconduct during closing argument by mischaracterizing the evidence relating to count 4. The prosecutor stated in relevant part: "So what did we hear about? The defendant grabbed [victim No. 2], which would be your force, your rude or offensive touching, he got her on her knees, he took her head and he tried to get her to orally copulate him. Again, that could be more force. That's all we're talking about. [¶] She described this to the Santa Ana police back in 2002 when she was interviewed. She talked about this incident with [the officer], and she talked to you again about it in 2011." Obviously, some of the specific details described by the prosecutor were not introduced into evidence (e.g., "got her on her knees" and "took her head"). But the rest of the description is supported by the evidence (e.g., defendant "tried to get her to orally copulate him," victim No. 2 talked about the incident to police and at trial). It is also a fair inference from the evidence to state that defendant "grabbed" victim No. 2, in that the evidence indicates defendant isolated victim No. 2 in the residence, kissed her, and tried to get her to perform oral sex.

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'" (*People v. Smithey* (1999) 20 Cal.4th 936, 960.) When a claim of prosecutorial misconduct focuses on comments made by the prosecutor to the jury, "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Ochoa* (1998) 19 Cal.4th 353, 427.)

"'Statements of supposed facts not in evidence, either because never offered, or offered and excluded or stricken, or admitted for a limited purpose outside the scope of the comment, are a highly prejudicial form of misconduct, and a frequent basis for reversal. The effect of such remarks is to lead the jury to believe that the district attorney, a sworn officer of the court, has information which the defendant insists on withholding; or that they may consider matters which could not properly be introduced in evidence.'" (*People v. Johnson* (1981) 121 Cal.App.3d 94, 103.)

"'As a general rule, a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.'" (*People v. McDowell* (2012) 54 Cal.4th 395, 436.) An admonition would not have been futile in the circumstances of this case, as the court could have reminded the jury that the attorney's statements were not evidence. (*Ibid.* [no objection necessary to review issue on appeal where objection would have been futile or admonition would not have cured the harm].) Defendant did not object to the prosecutor's characterization of the evidence and therefore forfeited his right to appeal this issue. (*People v. Turner* (2004) 34 Cal.4th 406, 422.) But defendant also argues his counsel provided ineffective assistance by not objecting to the prosecutor's statements, and by this route seeks to evade his forfeiture of the issue.[6]

---

[6] "To prevail on a claim of ineffective assistance, 'First, a defendant must show his or her counsel's performance was "deficient" because counsel's "representation fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] Second, he or she must then show prejudice flowing from counsel's act or omission. [Citations.] We will find prejudice when a defendant demonstrates a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Citations.] "Finally, it must also be shown that the [act or] omission was not attributable to a tactical decision which a reasonably competent, experienced criminal defense attorney would make."'" (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1523.)

9

Even assuming the prosecutor's statements were improper and defendant's failure to object fell below an objective standard of reasonableness, defendant did not suffer prejudice. As is typical, the jury was specifically instructed pursuant to CALCRIM No. 222 that "[n]othing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence." During its deliberations, the jury specifically requested and received a "read back" of victim No. 2's testimony with regard to count 4. The jury demonstrated that it was focused on victim No. 2's testimony to answer the question of whether count 4 was proven beyond a reasonable doubt, not the prosecutor's description of the evidence.

*Utilization of CALCRIM No. 1191*

Defendant posits the court committed prejudicial error by instructing the jury with a modified version of CALCRIM No. 1191. As provided to the jury, this instruction stated in relevant part, "The People presented evidence that the defendant committed the [four charged crimes]. These crimes are defined for you in these instructions. [¶] If you decide that the defendant committed one or more of these offenses beyond a reasonable doubt, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit any of the other charged offenses. [¶] If you conclude that the defendant committed one or more of these offenses, that conclusion is only one factor to consider, along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of any of the other charged offenses. The People must still prove each charge and allegation beyond a reasonable doubt."

In his opening brief, defendant contended "that the practice of allowing the jury to use charged offenses to conclude that appellant is likely to have committed other charged offenses violates due process, impedes the existence of an impartial jury, and

10

results in a trial neither fundamentally fair nor reliable." But, as defendant concedes in his reply brief, our Supreme Court subsequently rejected his argument in an indistinguishable case. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1167-1169 [no error in providing similar instruction to that used in instant case].) Defendant acknowledges "that this Court must follow *Villatoro* [citation] and that the instruction in *Villatoro* was substantially similar to the instruction in the current case." We therefore reject defendant's assertion of instructional error.

*Cumulative Error*

Defendant next asserts the cumulative effect of the court's errors and the prosecutor's misconduct resulted in an unfair trial. But only one instance of misconduct arguably occurred, and therefore no prejudice could accumulate. (See *People v. Phillips* (2000) 22 Cal.4th 226, 244.)

*Imposition of Consecutive Life Terms*

Applying an unspecified version of section 667.61 (the so-called One Strike law), the court imposed two consecutive sentences of 15 years to life with regard to counts 1 and 2. Defendant posits the court did not realize it had discretion to run these terms concurrently. The Attorney General agrees the terms could have been run concurrently, but claims the record does not establish that the court misunderstood the law.

"The One Strike law (§ 667.61) was added to the Penal Code in 1994. [Citations.] Like the Three Strikes Law, the One Strike law is an alternative sentencing scheme, but it applies only to certain felony sex offenses." "As with the Three Strikes law and statutory sentencing enhancements, the jury must first decide whether all the elements of the underlying substantive crime have been proven. If not, it returns an acquittal and the case is over. If the jury convicts on the substantive crime, it then

11

independently determines whether the factual allegations that would bring the defendant under the One Strike sentencing scheme have also been proven. Because the sentencing allegations have the potential to increase punishment, the defendant has a Sixth Amendment right to have their truth decided by a jury." (*People v. Anderson* (2009) 47 Cal.4th 92, 102-103.)

On count 1, the jury convicted defendant of the continuous sexual abuse of victim No. 1 when she was under age 14 (§ 288.5, subd. (a)). On count 2, the jury convicted defendant of lewd conduct against victim No. 2 when she was under age 14 (§ 288, subd. (a)). Defendant does not contest that these convictions were subject to the One Strike law (See, e.g., § 667.61, subds. (c)(8)-(9) [current version of One Strike law includes these offenses]; Stats. 2006, ch. 337, § 33, pp. 2163-2165 [same]). And the jury found the defendant had "been convicted in the present case . . . of committing an offense specified in subdivision (c) against more than one victim." (§ 667.61, subd. (e)(4) [current version]; Stats. 2006, ch. 337, § 33, pp. 2163-2165 [same language used in subd. (e)(5)].)

The One Strike law has been amended on numerous occasions since its inception. On appeal, defendant contends the version of the One Strike law in effect in the summer of 1999 (when count 2 occurred) is applicable to count 2 in this case. (Stats. 1998, ch. 936, § 9, pp. 5429-5431.) Unlike more recent versions, this former version of section 667.61 is silent with regard to whether the court should run imposed life sentences consecutively or concurrently. Thus, once the court determines the appropriate number of life sentences to impose under pre-September 2006 law, it then must exercise its discretion to determine whether to run such life sentences consecutively or concurrently. (§ 669; Cal. Rules of Court, rule 4.425; *People v. Rodriguez* (2005) 130 Cal.App.4th 1257, 1262 ["[A]lthough the statutory language of [former] section 667.61, subdivision (b), mandates the imposition of 15 years to life for *each* count involving

separate occasions and separate victims, section 667.61 does *not* mandate that those terms must be served consecutively"].)

In contrast, the post-September 20, 2006 versions (including the current version of the statute) provide: "For [applicable offenses], the court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6." (§ 667.61, subd. (i); see also Stats. 2006, ch. 337, § 33, pp. 2163-2165.) Thus, under more recent versions of the statute, consecutive life sentences are *mandatory* for each qualifying conviction. But recently amended versions of section 667.61, subdivision (i), do not include in their lists of qualifying offenses violations of section 288, subdivision (a), (lewd act on a child under 14, count 2) or 288.5, subdivision (a) (continuous sexual abuse of a child under 14, count 1). Thus, regardless of which version of the One Strike law applied, the court was required to exercise its discretion in deciding whether to sentence defendant to a consecutive or concurrent life term on count 2.

At the sentencing hearing, the court imposed two 15 years to life sentences and stated "that in doing so, it is noting that count 1 and count 2 dealt with two different victims and in the court's opinion . . . *those cannot be run concurrent to the other*." (Italics added.) The sentencing brief prepared by the prosecutor likewise stated that "these sentences must be served consecutively, not concurrently . . . ." Counsel for defendant did not provide the court with the analysis set forth above, i.e., the court had discretion to run the sentences concurrently under the language of the statute.

The record suggests the court did not understand it had discretion to run the two life sentences concurrently. Had the court realized it had discretion to run the sentences concurrently, it may well have decided it was appropriate to do so in light of the circumstances of the case. To wit, count 2 was based on a single pinch of victim No. 2's butt, yet it qualified defendant for mandatory life sentences under the One Strike law

13

on counts 1 and 2.  Had defendant not committed this act, he would have been sentenced pursuant to the determinate sentencing scheme rather than the One Strike law.  The other conduct against victim No. 2 occurred after victim No. 2 turned 14 and therefore did not qualify for sentencing under the One Strike law.  Moreover, count 1 was only eligible for sentencing under the One Strike law because of the multiple victims finding made with regard to counts 1 and 2.

## DISPOSITION

The judgment of conviction is affirmed, but the judgment is reversed as to defendant's sentence.  The case is remanded for resentencing in accordance with this opinion.


IKOLA, J.

WE CONCUR:


ARONSON, ACTING P. J.


FYBEL, J.

14