Filed 3/18/15  P. v. Morris CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RICHARD CURTIS MORRIS, JR.,<br><br>    Defendant and Appellant. | G048926<br><br>(Super. Ct. No. 08CF1591)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Francisco P. Briseno, Judge.  Affirmed.

J. Courtney Shevelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Martin E. Doyle, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

INTRODUCTION

Defendant Richard Curtis Morris, Jr., was found guilty of murder with special circumstances. On appeal, defendant contends the prosecutor committed misconduct during rebuttal closing argument by relying on facts outside the evidence. Specifically, defendant argues the prosecutor identified questions defendant's trial counsel did not ask of certain witnesses, and then proceeded to answer those questions. The prosecutor used the evidence before the jury to explain why the inference suggested by defendant was incorrect, but an inference pointing toward defendant's guilt was correct. Therefore, we reject defendant's argument, and we affirm.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

James Stockwell (who was also known as Jimmy Casino) owned the Mustang Club topless bar. On January 1, 1987, Stockwell returned to his condominium with his girlfriend, Shelly F., about 11:00 p.m. As they entered the condominium from the garage, Shelly and Stockwell were attacked by a man carrying a gun. As instructed, Shelly and Stockwell lay down on the dining room floor. As Stockwell was being handcuffed, Shelly noticed the presence of a second man. Shelly and Stockwell offered the men money and jewelry, and Stockwell offered to take them to his club to obtain more money.

One of the men took Stockwell upstairs. The other man then took Shelly upstairs; she saw Stockwell face down at the top of the stairs, where he was negotiating with the men. The men took Shelly into a bedroom. Both raped her. One of the men then tied Shelly up and told her they were going to take Stockwell to the club.

After the men left in Stockwell's Camaro, Shelly saw Stockwell on the floor, and realized he had been shot. Shelly had not heard any gunshots. Shelly ran to a neighbor's home for help. When she and the neighbor returned to her condominium, they discovered Stockwell was dead. A .22-caliber shell casing was found near Stockwell's

body.  Stockwell died as a result of a single gunshot wound to the head from a small caliber bullet.

A standard forensic sexual assault examination was performed on Shelly at the hospital, and various samples were collected from Shelly's clothes and body.  In 1987, blood type analysis was performed on the samples; DNA analysis was not then available.  The samples were analyzed again in 2009 and 2012, using DNA testing.  Defendant's DNA matched the DNA from the samples on all 15 markers used.  An expert witness testified that the odds of two unrelated individuals sharing the same DNA profile would be fewer than one in one trillion.  The expert also testified that while the DNA material might have degraded during the two decades between the commission of the crime and the time of DNA testing, the material could not change from one DNA profile to another.

In June 1987, defendant was in police custody for concealing a firearm used by an acquaintance in a robbery/murder.  At that time, defendant told Pasadena Police Detective Alan Sherwood he had information regarding an Orange County homicide.[1]  According to defendant, Mark Peck told him he had performed a contract killing in Orange County in exchange for $5,000.  Peck also told defendant he had used a .22-caliber automatic handgun with a silencer in committing the murder, and had stolen a Mercedes Benz.  Defendant told Detective Sherwood that Peck had provided this information to him three months earlier.

In May 2008, defendant was interviewed by two Orange County District Attorney's Office investigators.  Defendant told the investigators that Peck was going to rob a bar owner in Orange County with an individual named "Speedy."  When the investigators confronted defendant with the DNA evidence linking him to the attack on

---

[1]  Defendant was ultimately sentenced to 15 years in federal prison as a result of being a felon in possession of a firearm.  The jury in the present case was not told defendant was in custody when he made the statement.

3

Stockwell and Shelly, he denied participating in the rape and murder, denied going to the bar owner's home, and denied ever being in the bar.[2]

Defendant was charged in an information with one count of murder. (Pen. Code, § 187, subd. (a).) The information alleged three special circumstances: murder for financial gain; murder during the commission of a robbery; and murder during the commission of a rape. (*Id.*, § 190.2, subd. (a)(1) & (17)(i), (iii).) The information further alleged that defendant had previously been convicted of robbery, a serious felony. (*Id.*, § 667, subd. (a).)

A jury convicted defendant as charged, and found all the special circumstance allegations to be true. In a bifurcated proceeding, the trial court found the prior conviction allegation true. The court sentenced defendant to life in prison without the possibility of parole, plus a consecutive determinate five-year sentence. Defendant filed a timely notice of appeal.

DISCUSSION

I.

*STANDARD OF REVIEW*

Defendant argues that the prosecutor committed prejudicial misconduct during his rebuttal closing argument. "'"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citations.] Under state law, a prosecutor

---

[2] The appellate record is not clear to what DNA evidence the detectives were referring. According to the appellate record, the interview with defendant took place in 2008, while the DNA testing was conducted in 2009. Neither party addresses this inconsistency in their appellate briefs, and it does not affect the issue before us on appeal.

4

who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' [Citation.] . . . When a claim of misconduct is based on the prosecutor's comments before the jury, "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" [Citation.]" [Citation.]'" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 427.)

In closing argument, "'"[t]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom"'" [citation]." (*People v. Welch* (1999) 20 Cal.4th 701, 752.) A prosecutor may comment on a defendant's failure to introduce material evidence or to call logical witnesses. (*People v. Wash* (1993) 6 Cal.4th 215, 263.)

## II.

### THE COMPLAINED-OF ARGUMENT

Defendant argues the prosecutor committed misconduct during rebuttal closing argument by relying on facts which were not in the evidence and not matters of common knowledge. Specifically, defendant argues the prosecutor stated that defendant's trial counsel had not asked the Orange County crime laboratory blood analyst certain questions during her examination, yet offered the jury the answers the analyst would have given if she had been asked those questions.

Orange County crime laboratory analyst, Mary Hong, conducted the blood typing analysis on the rape kit and Shelly's clothing in 1987. Hong's testing showed the presence of A and H antigens, meaning a person with type A blood deposited the bodily fluids being tested. Hong determined Shelly was type A, but was a nonsecretor, meaning she was not the source of the nonblood bodily fluids. Defense witness, Gary Harmor, a forensic biologist, testified that blood and saliva samples from defendant determined he has blood type O and is a nonsecretor.

5

In closing argument, defense counsel argued defendant could not have been a contributor of the type A bodily fluids from Shelly's body and clothes because he was blood type O and a nonsecretor, making the DNA evidence linking him to the crime unreliable.

In rebuttal closing argument, the prosecutor challenged that argument as follows:

"[The prosecutor:]  Now, ABO testing.  Let's talk a little bit about ABO testing, because the defense is saying, well, look, if there is a type A that shows up in ABO testing, that means that the defendant is not guilty.  Okay.  Bear with me for just a minute and ask yourselves, did you ever hear that question asked during the course of the trial?  Right?  Supposedly this is the big—this is the big smoking gun that [defense counsel] has.  He kept telling you now here comes the important part in his closing argument, he kept telling you this is it.

"Why would you try an entire case, have two forensic scientists from the Orange County crime lab testify and not ask either one of them that question?  Why wouldn't you ask Ms. Hong, hypothetically, if you found type A in the ABO testing, and hypothetically my client is a type O, and the victim is a non-secretor, but a type A, wouldn't that mean my client is excluded as the source of the DNA?  Wouldn't you think that would be like on the top of your list of questions to ask an expert?  Of course it would be.

"So then why doesn't he ask that question?  Because he's going to get an answer that's not going to make him happy, because it's not true.  You're looking at apples and oranges.  Mary Hong never, ever said that the DNA was from somebody who was a type A blood type.  Ever.  It's not in the evidence.  Because you can't—you can't tell, you can't make that determination.

"[Defense counsel]:  Objection.  Facts not in evidence.

"The Court:  Overruled.

6

"[The prosecutor]: The defense went to all the trouble to call a serologist. Now, Mary Hong did the testing. He didn't ask her that question. When Mary Hong testified, he never asked her that hypothetical about if you find type A and my guy's an O, and the victim is a non-secretor, doesn't that mean it can't be his DNA? He didn't ask her, because the answer would have been no, that has nothing—

"[Defense counsel]: Facts not in evidence. Vouching.

"The Court: Overruled.

"[The prosecutor]: The answer would have been no, because here is why. We know there was a second person who raped Shelly. She testified to it. Now, whether that second person ejaculated or not, we don't know. We know—she said I thought they did, but I'm not sure. I'm not sure. We know that when Mary Hong did her DNA testing—well, let's first talk about the ABO testing. ABO. Okay. You test the fluids. You're not testing sperm. It's a fluid test. It's what it is. It's fluid. Your blood type will show up in saliva, seminal fluid, blood. That's where you get an ABO result from. Now, if somebody raped Shelly F. and did not ejaculate, but he had pre-ejaculate fluid, his ABO may show up in that fluid.

"[Defense counsel]: Objection. Facts not in evidence.

"The Court: Objection's overruled.

"[The prosecutor]: As I was saying, his ABO may show up in that fluid. [¶] Now, if you wash sperm, which is what they did in this test, if you isolate sperm, because when you have a rape test, and you get sperm, that is an identifiable source of DNA that you can say is differentiated from other cellular material. You can look at a sperm and say hey, that came from a man, okay, and I'm going to test that because that is the foreign material that sometimes gets deposited during a rape.

"So what they talked about, and [Orange County crime laboratory technician] Lisa Thompson talked about it, Mary Hong certainly talked about it, they wash the sperm in a series of chemicals to strip away everything but the sperm.

7

Sometimes they get some of the female epithelial cells in there as well, but what they are trying to do is wash that sperm off, and they did that with both the sperm from the rape kit and the sperm from the skirt.

"The test, the DNA test was sperm DNA, sperm fraction to sperm fraction, and it matched the defendant. There is no way around that. Sources of possible type A in an ABO, there [are] lots of ways around that, one of which, the most obvious of which is another perpetrator. But if he doesn't have sperm and his sperm wasn't DNA tested, it's not going to show up. It's just not. If you don't test his sperm for DNA, you're not going to get his DNA in the test, because it's washed sperm. It's not undifferentiated cellular material. And that's the big difference. Boy, it sounds good when you just say there is type A and my guy is not a type A, he's an O, and therefore he's innocent. But it's garbage. That's garbage."

## III.

### *ANALYSIS*

Defendant relies primarily on *People v. Johnson* (1981) 121 Cal.App.3d 94, in which the defendant was convicted of rape. The defense at trial was that the act of sexual intercourse was consensual, and the victim was trying to extort money from the defendant. (*Id.* at pp. 99-100.) In support of that defense, the defendant called as a witness the victim's former boyfriend, who testified the victim "asked him to relay a message to defendant that she would drop the charges if defendant would turn over his car and his bank account to her," which "was what she wanted in the first place." (*Ibid.*) The prosecutor did not recall the victim to rebut her former boyfriend's testimony. In closing argument, the prosecutor faulted defense counsel for failing to ask the victim about her statement to her former boyfriend. (*Id.* at p. 102.) The prosecutor also told the jury during argument that if he had recalled the victim, she "would deny having" made

8

that statement. (*Ibid.*) The prosecutor had previously put in evidence before the jury that he had personally interviewed the victim. (*Id.* at p. 100.)

The appellate court reversed the defendant's conviction because the prosecutor committed misconduct during his argument. "While in some circumstances it is proper for a prosecutor to comment upon a defendant's failure to ask certain questions of a witness, it is not permissible for a prosecutor to state what the answer to a question would be if it had been asked. [Citations.] Here, although there was no evidence in the record to indicate that [the victim] would deny making the extortion demand, the prosecutor told the jury that she would deny having done so. That this argument was prosecutorial misconduct cannot be denied." (*People v. Johnson*, *supra*, 121 Cal.App.3d at p. 102.) The court further found that the misconduct had denied the defendant his right of confrontation, and was therefore prejudicial. (*Id.* at p. 104.)

In this case, the prosecutor did not offer evidence during argument by, as did the prosecutor in *People v. Johnson*, telling the jury the victim would have testified to a particular fact. Rather, the prosecutor noted that defense counsel did not ask a logical question of the expert witness, which would have supported the defense theory, and demonstrated how that question would have been answered contrary to the defense theory, given the following existing testimony.

The evidence established that Shelly had been raped by two different men. Given defendant's blood type, he could not have contributed the type A blood antigens found when Shelly's clothing and rape kit were tested. This does not prove defendant did not rape Shelly, and therefore does not prove defendant was not involved in Stockwell's murder. The type A blood antigens could have been deposited by the other attacker, or they could be Shelly's; while Shelly was a nonsecretor, and, thus, her antigens would not show up in bodily fluids other than blood, it is reasonable to infer that Shelly's blood might have been in or on the material tested, meaning that the type A blood antigens were

9

hers.  The balance of the prosecutor's argument properly explained the difference between testing for DNA and ABO typing.

The prosecutor did not commit misconduct during his rebuttal closing argument.

DISPOSITION

The judgment is affirmed.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.

10