Filed 11/17/22  P. v. Garcia CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B311562 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. BA442346 |
| v. | |
| JOSUE GARCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Kennedy, Judge. Affirmed in part, reversed in part, and remanded with directions.

Sharon Fleming, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Josue Garcia of one count of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1), four counts of willful, deliberate and premeditated attempted murder (§ 664/187; counts 2–5), one count of criminal threats (§ 422, subd. (a); count 6), and one count of shooting at an occupied vehicle (§ 246; count 7). The jury also found true gang and gang-related firearm allegations. (§ 186.22, subd. (b)(1); § 12022.53, subd. (e).)

We reverse the gang and gang-related firearm allegations and vacate Garcia's sentence. On remand, the People may retry the allegations under the amendments to section 186.22. We otherwise affirm the judgment.

## PROCEDURAL BACKGROUND

Garcia and his codefendant Luis Ramos were charged by an amended information dated August 19, 2019. In count 1, the amended information charged Garcia and Ramos with the murder of Edwin Jurado (§ 187, subd. (a)). In counts 2 through 5, the amended information charged Garcia and Ramos with the attempted premeditated murder of Jose Delgado, Pablo Delgado, Sr., Pablo Delgado, Jr., and Christian Diaz (§ 664/187, subd. (a)). As to these five counts, the amended information included a gang/gun special allegation (§ 12022.53, subds. (d), (e)(1)). In count 6, the amended information charged Garcia with making criminal threats (§ 422, subd. (a)) against Alexious Buck. In count 7, Garcia was charged with shooting at an occupied vehicle (§246)

---

[1] All undesignated statutory references are to the Penal Code.

2

with additional special gun use allegations, including one pursuant to section 12022.53, subdivision (d) that Garcia personally discharged a firearm into an occupied vehicle causing great bodily injury.

The amended information further alleged that the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C) as to counts 1–5 and 7; § 186.22, subd. (b)(1)(B) as to count 6). For count 7, it was also alleged that the gang activity was carried out with the intent to promote, further, and assist in criminal conduct by a gang (§ 186.22, subd. (b)(4)).

The jury returned verdicts convicting Garcia of all counts and finding true all alleged enhancements.

On count 1, Garcia was sentenced to 50 years to life, comprising 25 years to life for first degree murder plus 25 years to life for principal firearm use with a gang allegation (§ 12022.53, subds. (d) & (e)(1)). On counts 2 through 5, Garcia was sentenced to 40 years to life for each count, comprising 15 years to life for the attempted premeditated murder plus 25 years to life for personal/principal firearm use with gang allegation (§ 12022.53, subds. (d) & (e)(1)). The court ordered the term for counts 3 through 5 to run concurrent to each other, and consecutive to count 2. On count 6, Garcia was sentenced to seven years, consisting of two years calculated as the mid-term for the section 422 offense plus five years for the gang enhancement. Finally, on count 7, the court imposed a 25 years to life sentence and stayed the sentence pursuant to section 654. Garcia was given 1,927 days of actual credit.

Garcia timely appealed.[2]

## FACTUAL BACKGROUND

### 1. The Murder and Attempted Murder Counts

In the early morning hours of September 28, 2013, Edwin Jurado was at a nightclub in Los Angeles, El Cafetal. Jurado was drunk and became involved in a dispute with approximately six members of the Park View clique of the MS-13[3] gang. After Jurado struck one of the female gang members, a security guard detained Jurado and walked the gang members out of the club. As they left the club, one of the gang members said that they planned "to pop the guy out." Jurado was a member of the rival 18th Street gang.

The MS-13 gang members headed from the club to a nearby apartment or "trap house" where they sold drugs, kept guns, and socialized. There, they discussed the incident at the club and decided to "go give a lesson to somebody that had disrespected them." Among those at the apartment were Garcia (also called Hyper); Ramos, a senior member of the Park View clique; Ramos' girlfriend, Dina Padilla; and Carlos Gonzalez (also called Husky), another member of the Park View clique. Garcia, Ramos, and Gonzalez each took a gun from a stash spot in the bathroom of the apartment before leaving. Garcia took a .38 revolver, Ramos took a semi-automatic gun, and Gonzalez took a small handgun. Shortly after 2:00 a.m., they and other MS-13 members drove to

---

[2] Ramos' conviction was affirmed by this court in *People v. Ramos* (May 14, 2021, B304855) [nonpub. opn.].)

[3] MS-13 refers to La Mara Salvatrucha gang.

4

the area of the nightclub. They parked in an area without surveillance cameras and waited for Jurado to approach.

Before leaving the apartment, Ramos had instructed Padilla to remain behind with two other women, including a Park View clique member called La Morena. However, La Morena persuaded Padilla to drive her back to El Cafetal. They found Jurado walking nearby and La Morena jumped out of the car and struck Jurado, knocking him to the ground. Ramos instructed the driver of their car to drop them off a block away and Garcia, Ramos, and Gonzalez ran to where La Morena and Jurado were. Garcia, Ramos, and other MS-13 gang members started to hit and kick Jurado. Jurado was also shot three times.

Pablo Delgado, Jr. was driving his father, Jose Delgado, his uncle, Pablo Delgado, Sr., and his uncle's friend, Christian Diaz, home after a Dodgers game when they witnessed the attack and saw that the victim was not defending himself. They decided to help the victim and stopped their car nearby. Diaz jumped out of the car and immediately saw an armed man approaching. Jose Delgado, who was sitting in the front passenger seat, attempted to get out as well but Garcia kicked the door closed. Garcia then fired into the car from the passenger side of the vehicle. Delgado, Jr. and Gonzalez heard two or three shots. Padilla heard more than five but less than 10 shots before she fled the scene. One bullet went through the open front passenger-side window of Delgado, Jr.'s car and shattered the driver's side window, while another struck the frame of the front passenger side door. Another bullet struck Diaz in the arm. Delgado, Jr. sped away before realizing that Diaz was no longer in the car. Diaz ran to a nearby metro station and was assisted by the security guards there.

5

Garcia, Ramos, and Gonzalez then ran back to their car. They drove past Jurado's body to confirm that he was dead before returning to the apartment. Jurado's cause of death was multiple gunshot wounds to the abdomen and chest. The two bullets recovered from Jurado's body were .38 or .357 caliber and were fired from the same weapon as another .38 or .357 caliber bullet recovered from the scene.

### 2.  The Criminal Threats Count

On July 3, 2014, Alexious Buck noticed Garcia and another Hispanic man entering the gate to her sister's apartment complex. When Buck asked if they needed anything, the men swore at her and grew belligerent. The men left but returned five minutes later with a gun. Garcia put the gun to Buck's head and the other man asked if she was ready to die. After Buck told them, "Do what you have to do," the men called her a racial slur and walked away. Buck called the police and reported where she observed the two men heading. She also informed them that she had seen the two men throw hand signs that made her believe they were part of a gang. Police apprehended Garcia inside a nearby apartment building.

## DISCUSSION

Garcia contends that his attempted murder convictions must be overturned on two grounds. First, Garcia argues that the evidence is insufficient to support four convictions of willful, deliberate, and premeditated attempted murder. He asserts that the evidence supports that he fired only three bullets at the car driven by Delgado, Jr. and, therefore, there is insufficient evidence to support a determination that he intended to kill all four passengers. Garcia also argues that the attack on the car

6

was a "rash impulse hastily executed" and that the evidence does not support that his actions were premeditated and deliberate. Second, Garcia contends that the prosecutor misstated the law or made appeals to the passion and prejudice of the jury on five separate occasions during closing argument, and that, independently or cumulatively, these arguments resulted in prejudice, requiring reversal of the attempted murder convictions.

We conclude that the evidence was sufficient to support four convictions for attempted murder and that the attempted murders were willful, deliberate, and premeditated. We further hold that any prosecutorial errors, together or singly, were not prejudicial and do not require the reversal of the attempted murder convictions.

Garcia also contends, and the Attorney General agrees, that the amendments made to section 186.22 pursuant to Assembly Bill No. 333 (AB 333) are retroactive and that the proof of the gang allegations offered at trial does not satisfy the requirements of section 186.22 as amended. The Attorney General also concedes that the gang-related firearm allegations found true must be vacated for insufficient evidence. We accept these concessions and reverse these true findings. They may be retried on remand.

Finally, Garcia contends that the failure to bifurcate the gang allegations pursuant to newly enacted section 1109, which was added pursuant to AB 333, requires that we reverse the judgment in its entirety. The Attorney General argues that section 1109 does not apply retroactively and that the failure to bifurcate the gang allegations was harmless in this case. Even assuming retroactivity, we conclude that it is not reasonably

7

probable that Garcia was prejudiced by any failure to bifurcate the gang allegations.

## 1. Sufficiency of the Evidence Supporting the Attempted Murder Convictions

### 1.1. Standard of Review

In assessing the sufficiency of the evidence to support a conviction, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; see also *Jackson v. Virginia* (1979) 443 U.S. 307; *People v. Perez*

8

(1992) 2 Cal.4th 1117, 1124; *People v. Snow* (2003) 30 Cal.4th 43, 66.)

### 1.2. Sufficient evidence supports Garcia's conviction for four counts of attempted murder.

Garcia contends that evidence was insufficient to support his conviction for four counts of attempted murder where the physical evidence supports that only three bullets were fired at the Delgados and Diaz. We conclude that the evidence was sufficient to support all four convictions.

"[A]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' [Citation.] . . . Express malice requires a showing that the assailant ' " 'either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' [Citation.]" ' [Citation.]" (*Ibid.*) "[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice. That the shooter had no particular motive for shooting the victim is not dispositive, although again, where motive is shown, such evidence will usually be probative of proof of intent to kill. Nor is the circumstance that the bullet misses its mark or fails to prove lethal dispositive—the very act of firing a weapon ' "in a manner that could have inflicted a mortal wound had the bullet been on target" ' is sufficient to support an inference of intent to kill. [Citation.]" (*Id.* at p. 742.)

9

In *Smith*, the defendant shot into a vehicle containing his ex-girlfriend, who sat in the driver's seat, and her baby, who was in a car seat directly behind her. (*Smith, supra,* 37 Cal.4th at p. 742.) The trajectory of the bullet showed "that it was fired from a position directly behind the car." (*Id.* at p. 743.) Though it "missed both the baby and the mother by a matter of inches[,] it shattered the rear windshield, passed through the mother's headrest, and lodged in the driver's side door." (*Ibid.*) The Supreme Court observed that, "in order for the jury to convict defendant of the attempted murder of the baby, it had to find, beyond a reasonable doubt, that he acted with intent to kill that victim, i.e., that he purposefully shot into the vehicle with 'a deliberate intent to unlawfully take away [the baby's] life' [citation] or knowledge that his act of shooting into the vehicle would, ' " 'to a substantial certainty,' " ' result in the baby's death. [Citation.]" (*Ibid.*) It concluded that these requirements were met, as the defendant's "very act of discharging a firearm into the car from close range and narrowly missing both mother and baby could itself support such an inference." (*Id.* at p. 744.)

Our high court further rejected the defendant's contention that a single bullet could not support two convictions for attempted murder because this was not a "kill zone" case.[4] The court explained that the " 'kill zone' theory does not preclude a

<hr>

[4] "[A] shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim." (*Smith, supra,* 37 Cal.4th at pp. 745–746.) The kill zone theory is discussed in more depth *infra* in Section 2.3.

conclusion that defendant's act of firing a single bullet at [his ex-girlfriend] and her baby, both of whom were in his direct line of fire, can support two convictions of attempted murder under the totality of the circumstances shown by the evidence." (*Smith*, *supra*, 37 Cal.4th at p. 745.) The court concluded that a kill zone rationale did not control in this case and that the defendant's arguments relied on "the incorrect assumption that a shooter who fires a single bullet at two victims who are both, one behind the other, directly in his line of fire, cannot, as a matter of law, be found to have acted with express malice toward both victims." (*Id.* at p. 746.)

More recently, in *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*), the Supreme Court discussed *Smith*, stating the defendant there "was properly convicted of two counts of attempted murder for having fired at close range a single bullet at a former girlfriend seated in the front seat of her car and the infant who was in a car seat immediately behind her, both of whom were in his direct line of fire." (*Id.* at p. 603.) The court reiterated the sufficiency of the evidence in *Smith* to establish an intent to kill: "evidence that the defendant discharged a lethal firearm at two victims who were seated directly in his line of fire supported an inference that he acted with intent to kill both victims." (*Id.* at p. 608.)

Turning to the facts present here, there is evidence that Garcia discharged a lethal firearm at two victims in the same direct line of fire, as well as firing at least two additional shots. The evidence supports that Garcia, who was armed with a revolver, approached the passenger side of the car and kicked the front passenger door closed when Jose Delgado tried to exit the vehicle, indicating that he was in very close range when he

11

opened fire. Padilla heard more than five but less than 10 shots, whereas Delgado, Jr. and Gonzalez heard three shots. Garcia shot through the open passenger side window, shattering the driver side window, while both Delgado, Jr. and his father were seated in the front row of the car. Garcia fired another shot that hit the front passenger door frame. Garcia also fired a shot that struck Diaz, who had exited the vehicle.

Even assuming that certain of the shots that Padilla heard were fired at Jurado and not at the Delgados and Diaz, the evidence supports a reasonable inference that Garcia intended to kill all four passengers of the car with the three bullets fired. Garcia fired at close range at two people in the same line of fire and fired at least two other bullets at or near the car, including the one that hit Diaz.

This case is therefore distinguishable from those cases in which defendants were convicted of multiple counts of attempted murder based on shots fired in the general vicinity of certain of the alleged attempted murder victims. In *People v. Perez* (2010) 50 Cal.4th 222, the defendant fired a shot from a slowly moving vehicle approximately 60 feet away, striking an officer. (*Id.* at p. 226.) Six other officers and one carjacking victim were also in the parking lot where the shooting took place. The carjacking victim was standing next to the officer who was shot, while the six other officers stood between two and 15 feet away from the injured officer. (*Id.* at p. 227.) The Supreme Court concluded that the evidence was "sufficient to support defendant's conviction of one count of premeditated attempted murder of a peace officer," but was "insufficient to sustain defendant's convictions of the remaining seven counts of attempted murder." (*Id.* at p. 230.) Unlike in *Smith*, where the single bullet was fired at close range

12

and both the mother and child were in the direct line of fire, "the evidence [was] insufficient to establish that defendant acted with the intent to kill two or more individuals by firing the single shot at the group of seven officers and a civilian." (*Id.* at p. 233.)

In *People v. Virgo* (2013) 222 Cal.App.4th 788, the defendant was a parolee at large who engaged in a shootout with officers who surrounded the house where he was staying. (*Id.* at pp. 792–796.) The defendant was convicted of 10 counts of attempted murder, one for each of the officers outside his home. (*Id.* at p. 797.) The court observed that, "to affirm each of defendant's 10 convictions of attempted murder, we search the record for substantial evidence indicating defendant committed a direct but ineffectual act toward killing each officer. We look to see if he fired at each of the 10 victims in a manner that could have killed them had defendant's aim been more on target." (*Id.* at p. 799.) The court concluded that evidence was only sufficient to support five convictions for attempted murder. The defendant fired four to seven shots at one group of four officers taking cover behind a car, which was sufficient to convict the defendant of attempting to murder each of those officers. (*Ibid.*) Another group of three officers who had taken cover at the northwest corner of the house testified that only one bullet had been shot in their direction, which was sufficient to support only one conviction for attempted murder. (*Ibid.*) There was no evidence that the remaining three officers had been fired at. (*Id.* at p. 800.)

There was no evidence in *Perez* or *Virgo* that two individuals were in the same direct line of fire of any of the defendants' shots. Moreover, unlike in those cases, Garcia did not fire at a dispersed group of individuals. Rather, the four passengers were clustered in or just outside of the car, and two of

13

the passengers were in the same direct line of fire. Based on our review of the record in its entirety, we conclude that a rational trier of fact could have concluded beyond a reasonable doubt that Garcia harbored an intent to kill each of the four passengers.

### 1.3. Sufficient evidence supports that the attempted murders were willful, deliberate and premeditated.

Garcia also contends that there is insufficient evidence to support that the attempted murders were willful, deliberate, and premeditated, citing testimony from Diaz and Delgado, Jr. supporting that the events transpired quickly. Garcia therefore contends that there was insufficient time to form a preconceived design to attempt to kill the people in the car. We hold that the evidence was sufficient to support the jury's conclusion.

"[U]nlike murder, attempted murder is not divided into degrees. The prosecution, though, can seek a special finding that the attempted murder was willful, deliberate, and premeditated, for purposes of a sentencing enhancement." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 605; see § 664, subd. (a); *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1049 ["attempted murder is not a lesser included offense of attempted premeditated murder, but premeditation constitutes a penalty provision that prescribes an increase in punishment"].) " 'In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " (*People v. Jurado* (2006) 38 Cal.4th 72, 118.) " ' "Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be

14

arrived at quickly." ' " ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 812.)

"In *People v. Anderson* [(1968) 70 Cal.2d 15, 26] (*Anderson*), [the Supreme Court] identified 'three basic categories' of evidence [it] has generally found sufficient to sustain a finding of premeditation and deliberation: (1) planning activity, or 'facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing'; (2) motive, or 'facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim'; and (3) manner of killing, or 'facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason". . . .' [Citation.]" (*People v. Morales* (2020) 10 Cal.5th 76, 88–89.) The *Anderson* factors also apply to whether an attempted murder was deliberate and premeditated. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1127–1128.) "In the years since *Anderson*, ' "[the Supreme Court] ha[s] emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight." ' [Citation.]" (*Morales*, at p. 89.) Further, "the Supreme Court has described the various *Anderson* categories in the disjunctive, inserting an 'or' in the series . . . ." (*People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1113.)

Applying these standards and viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence of all three *Anderson* factors. Contrary to Garcia's

15

contention, the record provides a reasonable inference of motive as to the attempted murders. A car unknown to the MS-13 gang members arrived at the scene and an individual got out. The jury could have reasonably inferred that Garcia believed that other members of the 18th Street gang had arrived to assist Jurado, and that his desire for retribution against Jurado would extend to other members of MS-13's rival gang. Alternatively, the jury could have inferred that Garcia wanted to eliminate any potential witnesses to the murder of Jurado. (See, e.g., *People v. Thomas* (1992) 2 Cal.4th 489, 518 [jury could "have found a ' "plausible motive" ' for [victim's] murder in defendant's need to eliminate a witness to his crimes"].)

The fact that Garcia was armed with a gun reflects evidence of planning activity. (See, e.g., *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1208 [gang member armed himself before attending party, showing a "willingness to take immediate lethal action" if need arose].) Even if the planning related to Jurado in the first instance, the jury could reasonably infer that Garcia was prepared to use the gun against any rival gang members or potential witnesses he and the other MS-13 members encountered while retaliating against Jurado.

Finally, although the incident arose unexpectedly, the manner of the attempted killing is indicative of premeditation and deliberation. Garcia did not shoot blindly from a distance. Rather, the evidence supports that Garcia ran over to the car and kicked one of the doors closed to prevent a passenger from getting out before firing multiple shots at the passengers of the vehicle from close range. (See, e.g., *People v. Sanchez* (2001) 26 Cal.4th 834, 849 [premeditation established in gang context even though time between seeing victim and actual shooting was brief]; *People*

16

*v. Francisco* (1994) 22 Cal.App.4th 1180, 1192 [manner of killing supported premeditation and deliberation where shooter's "car was only about five feet from the victim when the shooting started" and he fired multiple shots].)

In sum, our review of the three *Anderson* factors—planning, motive, and manner of killing—supports that there is sufficient evidence that the attempted murders were willful, deliberate, and premeditated.

### 2. Prosecutorial Misconduct

### 2.1. Standard of Review

"We review claims of prosecutorial misconduct pursuant to a settled standard. 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " ' [Citations.] In addition, ' "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" ' [Citation.] Objection may be excused if it would have been futile or an

17

admonition would not have cured the harm." (*People v. Dykes* (2009) 46 Cal.4th 731, 760 (*Dykes*).)

"It is considered misconduct to misstate the law to the jury, and bad faith is not required. [Citation.] But a prosecutor is allowed to vigorously argue the case and is afforded 'significant leeway' in discussing the facts and the law in closing argument. [Citations.]" (*People v. Azcona* (2020) 58 Cal.App.5th 504, 516 (*Azcona*).) Prosecutors also have wide latitude to comment on the state of the evidence and draw reasonable inferences or deductions. (*People v. Martinez* (2010) 47 Cal.4th 911, 957.) " 'Whether the inferences the prosecutor draws are reasonable is for the jury to decide.' " (*People v. Wilson* (2005) 36 Cal.4th 309, 337.) " '[W]e "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

### 2.2. Yellow Light Analogy

Garcia contends that the prosecutor misstated the law of willful and deliberate premeditation by analogizing the required process to the decision of whether to go through a yellow light. He asserts that the prosecutor's arguments improperly minimized the required elements of premeditation and deliberation and reduced the prosecution's burden of proof. He argues that his attempted murder convictions "must therefore be reduced to second degree attempted murder."[5] We conclude that there was

---

[5] The offense of "second degree attempted murder" does not exist; unlike murder, attempted murder is not divided into degrees. (See *People v. Favor* (2012) 54 Cal.4th 868, 876.) We understand Garcia's

no misconduct. Even if we assumed error, Garcia has failed to demonstrate prejudice resulting from the prosecutor's analogy.

### 2.2.1. Additional Facts

The court instructed the jury on deliberate and willful premeditation in connection with both murder and attempted murder. With respect to attempted murder, the court instructed the jury: "The defendant acted willfully if he intended to kill when he acted. [¶] The defendant deliberated if he carefully weighed the consequences for and against his choice, and knowing the consequences, decided to kill. [¶] The defendant acted with premeditation if he decided to kill before completing the acts of attempted murder. [¶] The attempted murder was done willfully and with deliberation and premeditation if either the defendant or a co-participant or both of them acted with that state of mind. [¶] The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated. [¶] The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. [¶] A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated. [¶] On the other hand, a cold, calculated decision to kill can be reached quickly. [¶] The test is the extent of reflection, not the length of time. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If

_____

argument to be that his convictions must be reduced to attempted unpremeditated murder.

19

the People have not met this burden, you must find this allegation has not been proved."

The court also instructed the jury: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

During her closing argument, the prosecutor discussed the facts of the case at length before turning to the law, including the difference between first degree murder and second degree murder and the requirement that first degree murder must be willful, deliberate, and premediated. The prosecutor went on to state: "So let's put that into some context. This analogy is a good—sums up how quickly somebody can reach premeditation and deliberation. When you are driving down the street and you are going— approaching a traffic light and that light turns yellow, you have to make a very quick decision. Are you going to gun it and get through that intersection? Or are you going to brake and stop for what will become the red light? It is a split-second decision. But that thoughtfulness and quick, rapid decision is sufficient for premeditation and deliberation."

The prosecutor also showed the jury a slide listing other factors that might go into a decision to go through a yellow light, including: "How fast am I going? [¶] Can I stop in time or is it safer to pass through the intersection? [¶] Is the street wet? [¶] Is cross traffic starting to cross? [¶] Are pedestrians entering the crosswalk?" The slide further stated: "That split second decision involved: [¶] DELIBERATION – Is it safer to enter or to stop? [¶] PREMEDITATION – Weighing beforehand." The prosecutor did not read the contents of the slide out loud. Defense counsel made no objections.

### 2.2.2. Analysis

Notwithstanding the lack of objections, Garcia argues that we should address his contention that prosecutorial error requires that the finding of premeditation be reversed as to his attempted murder convictions.[6] If we find the issue was waived by failure to object, he contends that he received ineffective assistance of counsel. We conclude that the issue was waived, as Garcia has failed to establish that an objection or admonition would have been futile. (*Dykes*, *supra*, 46 Cal.4th at p. 760.) However, we exercise our discretion to address the claim on the merits to eliminate the need to address Garcia's alternative ineffective assistance of counsel claim. (See *In re Victor L.* (2010) 182 Cal.App.4th 902, 928.)

Garcia argues that the prosecutor misstated the law because her "oral argument made no mention of taking multiple factors into account, instead contending that it was simply a matter of 'gunning' the car, or stopping." Garcia concedes that the prosecutor's PowerPoint included several additional factors that one might consider, but argues that the prosecutor failed to mention them or put them into context. Garcia also argues that the prosecutor's argument was misleading because it failed "to acknowledge the very significant difference between deciding whether to stop at a yellow light and making a willful, deliberate and premeditated decision to kill."

We disagree. The context of the slide accompanying the prosecutor's argument concerning the yellow light analogy was clear. Even if her oral argument understated the necessary level

---

[6] Garcia does not argue that the first degree murder conviction should be reversed.

of deliberation, the prosecutor's overall presentation of the analogy (i.e., also taking into account the contents of the slide) conveyed a decision-making process reflecting premeditation and deliberation consistent with the court's instruction.

The prosecutor's overall presentation of the analogy was very similar to yellow light analogies that have been found proper. In *People v. Avila* (2009) 46 Cal.4th 680, 715 (*Avila*), the Supreme Court rejected the defendant's contention that the prosecutor had argued "that 'the "cold, calculated" judgment of murder is the equivalent of deciding whether to stop at a yellow light or proceed through the intersection.' Rather, the prosecutor used the example of assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, as an example of a 'quick judgment' that is nonetheless 'cold' and 'calculated.' He then immediately said, 'Deciding to and moving forward with the decision to kill is similar, but I'm not going to say in any way it's the same. There's great dire consequences that have a difference here.' " The court therefore concluded that the prosecutor had not engaged in any misconduct. (*Ibid.*)

In *People v. Son* (2020) 56 Cal.App.5th 689, 698 (*Son*), the prosecutor stated during closing argument: " 'Rarely do people who kill have a good enough reason for what they did. This [i.e., premeditation] isn't my motive or what I think would be a good idea. It's simply a consideration of consequences and actions. And that the decision to kill is made during the course of killing, if not wholly before. [¶] Some examples of this are the difference between shooting someone a single time and pulling the trigger a

22

second time. [¶] The decision a person makes when approaching a yellow light as it may be likely to phase red. A weighing of consequences. Am I going to make it? Am I going to be involved in an accident? Am I going to get a ticket? I look to the left. I look to the right. And I go for it.' "

The court in *Son* found no error in the yellow-light example provided. The court explained that, "[a]t least in the way the prosecutor framed it, if someone were to go through the decision-making process the prosecutor described, the decision to proceed through the intersection would be premeditated." (*Son, supra*, 56 Cal.App.5th at p. 699.) The court rejected defendant's contention, based on *Avila*, "that it is improper to analogize premeditation to a yellow light unless it is accompanied by the caveat that going through a yellow light is less serious than murder." (*Id.* at p. 699.) The court in *Son* explained that "[t]he only thing the *Avila* court said was that the prosecutor did not argue that going through a yellow light is the 'equivalent' of murder," and noted that "[t]he prosecutor in our case did not draw such an equivalence either. It was obviously an analogy." (*Id.* at pp. 699–700.)

In *Azcona, supra*, 58 Cal.App.5th 504, 516, the prosecutor similarly argued: " 'Everybody here has traveled into an intersection . . . where the light turns yellow. Okay? When you travel into that intersection and that light turns yellow and you're going to make a decision to go through that light, [. . .] what are the two things you look for? Cars and cops. That's what you're going to look for. And then if you decide to go through, you've looked, you've thought about it. Are there cars? Are there cops? Happens to everybody. Common sense. [¶] So when you do that, you have deliberate[d], you thought about it before you've

23

done it. What are the consequences? I could hit a car, a cop could catch me. You've deliberated it. And then when you went through the light, you premeditated before you went ahead and went through that light. You deliberated and premeditated it. It's as simple as that." The court found "no fault with the analogies used here" and noted that "the Supreme Court found nothing wrong with essentially the same yellow light analogy in [*Avila*]." (*Ibid.*) The defendant, like the defendant in *Son*, argued that "the prosecutor's argument here trivialized the concept of premeditated murder compared to *Avila*, where the prosecutor expressly acknowledged that ' "[d]eciding to and moving forward with the decision to kill" ' was not the same, since it involves ' "great dire consequences." ' " (*Ibid.*) The court found "no suggestion that the decision to kill someone is no more consequential than deciding to drive through a yellow light . . . Rather, the prosecutor's point was that the time required for premeditation is no greater than the time needed to make those other (far less consequential) decisions." (*Id.* at p. 517.)

Like the courts in *Son* and *Azcona*, we reject the contention that the prosecutor acted improperly by failing to expressly state that going through a yellow light is less serious than premeditated and deliberate murder. The prosecutor did not suggest that two acts were equivalent; rather, she made clear that the yellow light example was an "analogy" intended to "sum[ ] up how quickly somebody can reach premeditation and deliberation." Thus, as in the above cases, the yellow light analogy was used to illustrate how a premeditated and deliberate decision to kill could happen quickly, but that premeditation and deliberation nevertheless require at least some degree of weighing the consequences. This analogy accurately reflects the

24

law in that a defendant can quickly make a deliberate, premeditated decision to kill. (*People v. Solomon, supra*, 49 Cal.4th at p. 812 [" ' "Premeditation and deliberation can occur in a brief interval" ' "].) We therefore conclude that it was not reasonably probable that the jury was misled by this argument.

Even if we assumed error, Garcia has failed to show prejudice. He has not shown there is a reasonable probability that the result of the proceeding would have been more favorable to him but for counsel's failure to object. The jury was correctly instructed on the concept of premeditation and deliberation in connection with both murder and attempted murder. The jury was also instructed that, if the attorneys' comments on the law conflicted with the trial court's instructions, they must follow the law as the trial court explained it to them. " 'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." [Citation.]' " (*People v. Centeno, supra*, 60 Cal.4th at p. 676.)

### 2.3. Kill Zone

Garcia contends that the prosecutor's invocation of the kill zone theory in her closing argument constituted a misstatement of law and improperly circumvented the requirement that the jury find intent as to each of the four alleged murder victims. Although we agree that the prosecutor made a minor misstatement of law and that the kill zone theory is inapplicable under the facts of this case, we conclude that it is not reasonably

25

probable that any error committed by the prosecutor was prejudicial.

### 2.3.1. Additional Facts

With respect to attempted murder, the court instructed the jury, in relevant part: "The defendant is charged in counts two through five with attempted murder. To prove that the defendant is guilty of attempted murder, the People must prove that, number one, the defendant took at least one direct but ineffective step toward killing another person; and number two, the defendant intended to kill that person."

During her closing argument, the prosecutor argued with respect to attempted murder: "When Hyper opened fire on that car and shot at that car at least three times, does it matter which of the victims he intended to strike? [¶] Why is he shooting at an occupied car with one of those windows down? Obviously to try to strike and shoot the occupants of that car. [¶] Does it matter if he wanted to hit the front passenger or if he wanted to hit the driver or if he wanted to hit the rear passenger? No, because his intent is to the entire car. So everyone in that car is part of his intent to kill. [¶] Kind of like if you decide you want to kill this pilot of this plane and you put a bomb on the plane that he is flying; you've also basically — your intent to kill is going to transfer to all of the passengers on that plane." Defense counsel did not object.

### 2.3.2. Analysis

Despite the absence of an objection, we again elect to address Garcia's claim on the merits to eliminate the need to address his alternative argument premised on ineffective assistance of counsel.

"[T]he kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.) In other words, "[w]hen the kill zone theory is used to support an inference that the defendant concurrently intended to kill a nontargeted victim . . . evidence of a primary target is required." (*Id.* at p. 608.)

The court properly declined to instruct the jury on the kill zone theory, as there was no evidence to support that Garcia had a primary target in Delgado, Jr.'s car. (See also *People v. Cardenas* (2020) 53 Cal.App.5th 102, 113 ["[T]he Supreme Court has repeatedly explained that a kill zone instruction is never required."].) The court also fully instructed the jury concerning the elements of attempted murder, including that an element of that crime is that the defendant harbored the specific intent to unlawfully kill another human being. The jury was not instructed that it could find Garcia guilty of the attempted murder of one person based on a finding that he intended to kill a different

27

person. The instructions given by the court were correct and unambiguous.

Although the jury was instructed with the correct law, Garcia argues that he was prejudiced by the prosecutor's purported misstatement of the law regarding the kill zone theory. As a preliminary matter, only the analogy to a bomb on a plane—the final sentence of the portion of the prosecutor's argument identified by Garcia—appears to invoke the kill zone theory, though the prosecutor never refers to the theory by name. In the preceding sentences, the prosecutor appears to assert that, by firing repeatedly at the car at close range, Garcia demonstrated an intent to kill everyone in the car and did not need to have the intent to kill a specific individual among them. Separate and apart from the kill zone theory, our Supreme Court has recognized that "a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person." (*People v. Stone* (2009) 46 Cal.4th 131, 140 (*Stone*).)[7] The court explained that where a defendant sprays bullets at an occupied house, "simply to kill everyone who happened to be present, without any primary target," the defendant may be convicted of attempted murder. (*Ibid*.) The

---

[7] Garcia argues that that the kill zone theory does not depend on the defendant intending to kill an identifiable primary target, citing *Stone*. However, in *Canizales*, the Supreme Court rejected this precise argument and explained that the court in *Stone* "was not referring to the kill zone theory" when it made the observation that a specific target is not required to convict a defendant of attempted murder. (*Canizales, supra*, 7 Cal.5th at p. 608; see also *People v. McCloud* (2012) 211 Cal.App.4th 788, 802, fn. 6 [the kill zone theory and the *Stone* theory "are mutually exclusive"].)

Supreme Court observed "difficulties can arise . . . regarding *how many* attempted murder convictions are permissible" in such circumstances and cited *Smith* as an example of a case addressing how many convictions a shooting can support. (*Ibid.*) As discussed above, the evidence supports that Garcia fired at least three shots at the car at close range, including at two individuals in the same direct line of fire. Thus, under *Stone* and *Smith*, there was sufficient evidence of intent to kill all four individuals. We find no misstatement of law with respect to this portion of the argument.

Turning to the prosecutor's reference to the kill zone theory, the plane bombing example is consistent with the description of the theory in *Canizales*. The example identified a primary target (the pilot), the type and extent of force the defendant used (a bomb) support an inference is that the defendant intended to create a zone of fatal harm, and the alleged attempted murder victims (the passengers of the plane) were within that zone of harm. (*See Canizales*, *supra*, 7 Cal.5th at p. 607.) However, the prosecutor incorrectly characterized the defendant's intent to kill the pilot as "transfer[ring]" to the passengers. "[T]he doctrine of transferred intent does not apply to attempted murder." (*People v. Bland* (2002) 28 Cal.4th 313, 331.) A "defendant may be convicted of the attempted murders of any within the kill zone, although on a concurrent, not transferred, intent theory." (*Ibid.*)

In evaluating the degree of prejudice arising from a prosecutor's misstatements of the law, courts may look to (1) whether the misstatements were fleeting or pervasive (*People v. Cortez* (2016) 63 Cal.4th 101, 133–134; *People v. Otero* (2012) 210 Cal.App.4th 865, 873); (2) whether the evidence of the

defendant's guilt on the issue affected by the misstatement was close or overwhelming (*People v. Fayed* (2020) 9 Cal.5th 147, 205; *Otero*, at pp. 873–874; *People v. Bryden* (1998) 63 Cal.App.4th 159, 182); (3) whether other jury instructions obviated the effect of the error (*Otero*, at p. 873); and (4) whether the jury made other findings that necessarily indicate that the error had no effect (*People v. Forrest* (2017) 7 Cal.App.5th 1074, 1086).

Here, the prosecutor's misstatement of law was fleeting. Moreover, although the prosecutor used the term "transfer," her example was in every other way consistent with a theory of concurrent intent. She did not argue, for example, that shooting a bullet with the intent to kill Person A and accidentally missing and shooting Person B is sufficient to support an intent to kill Person B. Moreover, to the extent that the prosecutor's argument suggested that intent to kill could be transferred, it was not supported by the court's instructions, which we presume the jury followed. Thus, even though Garcia's guilt as to all four counts of attempted murder was not overwhelming,[8] it is not reasonably

---

[8] Garcia cites the jury's request for a readback of Padilla's testimony concerning the shooting at the car driven by Delgado, Jr. as supporting that the kill zone argument was prejudicial. Although a jury's questions during deliberations can be instructive in assessing prejudice, a request for readback is not dispositive. (*Canizales*, *supra*, 7 Cal.5th at p. 617.) The request for readback here does support that the jury was focused on the issue of attempted murder. However, the readback request here is not as instructive on the jury's mindset as the request in *Canizales*. There, the jury asked for testimony from one of the alleged murder victims "to the effect that '[t]hey weren't shooting at me.'" (*Ibid.*) The alleged murder victim had testified, "'To be honest, I don't feel he was shooting at me . . . . But he was shooting our way.'" (*Ibid.*) Thus, both the request and the testimony read back to the jury went directly to the issue of whether the defendant had intent

probable that a result more favorable to Garcia would have been reached without the the prosecutor's passing reference to a transfer of intent.

Although Garcia frames his argument as being based on the prosecutor's misstatement of the law, Garcia's argument also seems to be that the prosecutor argued the kill zone theory in a case where it does not fit the facts, thus potentially misleading the jury. We agree that the analogy is an uneasy fit. The theory set forth in *Stone* and the kill zone theory are similar only in that both permit a fact finder to infer an intent to kill individuals who were not necessarily individually targeted by the defendant, based on the force used by the defendant. (*See Canizales*, *supra*, 7 Cal.5th at pp. 608–609.) Other than this high-level similarity, the plane bombing analogy is not pertinent. As we have stated, there was no evidence of a primary target in this case. Moreover, a revolver certainly does not have the same force or destructive power as a bomb. (Cf. *People v. Perez*, *supra*, 50 Cal.4th at p. 232 [kill-zone theory was inapplicable because shooting a single bullet was "not the equivalent of using an explosive device with intent to kill everyone in the area of the blast, or spraying a crowd with automatic weapon fire, a means likewise calculated to kill everyone fired upon"].)

After *Canizales*, where a trial court has instructed the jury on the kill zone theory in the absence of the necessary evidentiary support, appellate courts have generally found

---

to kill that specific victim. Although we agree that the request here may suggest that the jury did not find the evidence supporting the four counts of attempted murder to be overwhelming, it does not compel the conclusion that there was a reasonable probability of a more favorable result in the absence of the argument.

prejudicial error. (See, e.g., *In re Lisea* (2022) 73 Cal.App.5th 1041, 1056.) However, there is a significant difference between a court instructing a jury on a theory of law that does not fit the facts of the case and a prosecutor briefly arguing such a theory in her closing argument. "[A]lthough pertinent to the prejudice calculation, the arguments of counsel 'are not to be judged as having the same force as an instruction from the court.' " (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 586 (conc. opn. of Arabian, J.), quoting *Boyde v. California* (1990) 494 U.S. 370, 384–385.) The prosecutor here raised a hypothetical crime that she asserted was "kind of like" the circumstances present in this case. Unlike principles of law presented by the court, "[t]he jury was free to accept or reject that argument." (*People v. Dennis* (1998) 17 Cal.4th 468, 548.) In light of the prosecutor's wide latitude to comment on the state of the evidence (*People v. Martinez, supra*, 47 Cal.4th at p. 957), and to " ' "vigorously argue [her] case" ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819), and given the brevity of the prosecutor's argument concerning the kill zone theory, we are not persuaded that the prosecutor committed prejudicial error in arguing the analogy.

The circumstances present here are also distinguishable from those present in *People v. Anzalone* (2006) 141 Cal.App.4th 380, a case where, as here, the court did not instruct the jury on the kill zone theory but the prosecutor raised the theory in closing argument. In *Anzalone*, the defendant was prevented from stealing a car by the owner of the car, Che Love, and Love's three friends. The defendant returned to the scene in his own car and fired a shot at Love, which hit Love's car just above his head, and a second shot at the trunk of Love's car, behind which Love's friends were taking cover. (*Id.* at p. 384.) The prosecutor argued

that the evidence supported four convictions for attempted murder even though only two bullets were fired, stating: "Here is the way the law says it is. Something called the zone of danger. Anytime someone is within the zone of danger, whether it be one, two, three or twenty people, somebody indiscriminately shoots towards a crowd of people, everything in that zone of danger qualifies." (*Id.* at p. 391.) The court in *Anzalone* concluded that the prosecutor's argument concerning zone of danger was erroneous and misleading, as the prosecutor "did not explain what constitutes a 'zone of danger' or how such a zone relates to the element of intent" and "did not tell the jury that the zone is defined by the nature and the scope of the attack and that the attack must reasonably allow the inference that defendant intended to kill some primary victim by killing everyone in that primary victim's vicinity." (*Id.* at p. 392.) Although "the trial court did not err in the manner in which it instructed the jury concerning attempted murder," the court of appeal concluded that "the prosecutor committed error when he misstated the law relevant to the definition of attempted murder." (*Id.* at p. 393.) The court of appeal concluded that defense counsel had provided ineffective assistance when he failed to object to the prosecutor's argument concerning the kill zone theory. (*Id.* at p. 395.)

Although inapposite, the hypothetical presented by the prosecutor in this case was largely a correct statement of the kill zone theory. In contrast, in a case with closer facts than those present here, the prosecutor in *Anzalone* suggested that the law provides that anyone within a vague zone of danger is an attempted murder victim, regardless of how many bullets are fired. Further, the prosecutor here did not purport to be

33

instructing the jury on a new point of law when she raised the bombing analogy.

In conclusion, viewing the challenged comments in the context of the prosecutor's entire argument and the court's instructions, we find no reasonable likelihood the jury construed or applied the prosecution's challenged remarks in an objectionable fashion, and therefore reject Garcia's claim of prosecutorial misconduct. We are also not persuaded that the prosecutor's brief misstatement of law violated defendant's federal constitutional right to due process, which would require us to determine whether the claimed error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)

### 2.4. Greenlighting

Garcia contends that the prosecutor's assertion in closing argument that Garcia and Ramos would "green light" Gonzalez— i.e., target him to be beaten or killed (See, e.g., *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1399, fn. 2; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 148)— for testifying against them was prejudicial and that defense counsel's failure to request an admonition should be excused because it would have been futile. We conclude that an admonition would not have been futile. Even if we reached the merits, we would conclude that it is not reasonably probable that Garcia would have obtained a better outcome without the prosecutor's reference to green lighting.

### 2.4.1. Additional Facts

As discussed above, Gonzalez participated in the murder of Jurado and the attempted murders of the Delgados and Diaz. In the months after the murder and attempted murder, Gonzalez

34

spent more time with the Park View clique and learned about more things they had done. He decided to leave the city to get away from MS-13 and then left the state. In 2016, officers investigating the incident outside El Cafetal located Gonzalez in Utah. He decided to cooperate with officers and ultimately reached a plea agreement with the Los Angeles District Attorney's Office. Pursuant to this agreement, in exchange for his truthful testimony in this and another case, Gonzalez's sentence will be reduced from 25 years to life (second degree murder plus a ten-year gang enhancement) to 13 years determinate (manslaughter plus a 10 year gang enhancement). At trial, Gonzalez testified that he believed his life and the lives of his family were in danger because of his decision to testify. He stated that MS-13 often retaliates against family members and will kill a person who testifies against the gang if possible.

Los Angeles Police Department Officer Tomas Perez, a gang expert, similarly testified that MS-13 harbors the view that people who cooperate with law enforcement will be retaliated against. He stated that the mindset of "snitches get stitches" is "how MS-13 perceives people who cooperate with the court system and police."

The court instructed the jury that it could not rely on evidence of gang activity to establish that Garcia "is a person of bad character or that he has a disposition to commit crimes." The court also instructed the jury that the attorney's statements were not evidence.

In her closing argument, when discussing the risks Gonzalez took in testifying against members of MS-13, the prosecutor stated: "That still remains to be seen how [the plea agreement] will pan out for him; he had to come in here under

oath in a courtroom in front of you jurors and answer my questions under oath. And then he had to face these two defendants, these two MS-13 gang members. He has to face them and you better believe they are looking at him and green lighting him." Defense counsel objected to the reference to greenlighting and the objection was sustained, but no admonition was requested.

### 2.4.2. Analysis

As discussed above, a defendant may not complain on appeal of prosecutorial misconduct unless the defendant made a timely objection *and* requested that the jury be admonished to disregard the impropriety. This requirement is excused only if an objection would have been futile or an admonition would not have cured the harm. (*Dykes*, *supra*, 46 Cal.4th at p. 760.)

Garcia argues that an admonition would have been futile because "the damage was done when the prosecutor accused [Garcia] and his co-defendant of plotting retaliation against Husky Gonzalez for his testimony against them" and that "no admonition 'would have unrung this particular bell,' " citing *People v. Johnson* (1981) 121 Cal.App.3d 94, 104. "The ritual incantation that an exception applies is not enough." (*People v. Panah* (2005) 35 Cal.4th 395, 462.) A defendant must identify evidence in the record to support the assertion that an admonition is futile. (*Id.* at p. 463.) Garcia has failed to do so.

The circumstances in *People v. Johnson*, *supra*, 121 Cal.App.3d 94 are also distinguishable. There, the prosecutor claimed that the victim would have denied making an extortion demand to the defendant through his friend, despite there being no evidence that she would have done so, and stated that he had personally investigated the matter and believed that the

36

defendant's friend had told "an outright lie." (*Id.* at p. 102.) The court concluded that the prosecutor had not merely offered an interpretation of the testimony, but had instead asserted that he had direct, personal knowledge based on their conversation that the defendant's friend was lying. (*Id.* at pp. 102–103.)

Here, the prosecutor did not represent to the jury that she personally believed that Gonzalez was telling the truth, or that she knew, based on her own investigation, that the defendants had put a green light on Gonzalez. Based on Gonzalez's and Officer Perez's testimony, the prosecutor could properly raise the inference that the defendants or other members of MS-13 might seek to injure or kill Gonzalez for his cooperation with law enforcement. Although it may have been improper for the prosecutor to suggest that the defendants had or definitely would do so, we are not persuaded that an instruction could not have ameliorated any harm arising from this statement. Thus, the claim of prosecutorial misconduct as to this statement was not preserved.

Even if we addressed this issue, we would not find it to be prejudicial. This assertion was made in the context of discussing Gonzalez's credibility and the prosecutor made no further reference to green lighting in her closing argument, which comprises over 60 pages in the reporter's transcript. The court also instructed the jury that the attorney's statements were not evidence and that it could not rely on evidence of gang activity to establish that Garcia has a predisposition to commit crime. In light of these instructions, it was not reasonably probable that the jury would convict Garcia based on his membership in a gang known to violently retaliate against those who testify against it,

rather than a determination that he was guilty of the charged offenses.

### 2.5.  Comment on Buck's 911 Call

Garcia contends that the prosecutor's argument asking why Buck should not have called the police after she was threatened was improper because "[t]here was no suggestion that Ms. Buck did anything wrong by calling, or had no right to call the police" and that "the jurors would have taken this argument as urging them to take action against the defendants as a general way to fight back against community gang violence." We find no error.

### 2.5.1.  Additional Facts

In her closing argument, while summarizing the evidence supporting the charge of a criminal threat against Buck, the prosecutor argued: "And she called 911 because why should the community have to put up with that kind of behavior? Everyone just get[s] bullied again and again and let it go? And it's—" Defense counsel objected and the trial court overruled the objection.

### 2.5.2.  Analysis

"It is improper for the prosecutor to appeal to the passion and prejudice of the jury in closing argument during the guilt phase of trial." (*People v. Simington* (1993) 19 Cal.App.4th 1374, 1378; see *People v. Seumanu* (2015) 61 Cal.4th 1293, 1342.) The prosecutor's statements did not run afoul of this rule.

The jurors could reasonably infer from the evidence that, when Garcia put a gun to Buck's head, he was attempting to intimidate her and discourage her from interfering and speaking out. To the extent the prosecutor was also urging the jurors to

take a stand against gang members who would seek to intimidate victims from reporting misconduct, "the prosecutor's comments were tantamount to comparing the jury to ' "the conscience of the community," ' a practice [the Supreme Court] ha[s] routinely upheld as proper." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 789.) Indeed, the prosecutor's comments here appear less direct than those of the prosecutor in *Holmes*, who "urge[d] the jury to solve the social problems of gangs and violence by returning convictions," which the Supreme Court found to be acceptable. (*Ibid.*)

Even if the prosecutor's arguments could be interpreted as an improper appeal for sympathy or juror action, there is no reasonable probability that a result more favorable to Garcia would have been reached if the court had sustained the objection and admonished the jury. Substantial evidence supports that Garcia threatened Buck with a gun.

### 2.6. Headline

Finally, Garcia contends the prosecutor's use of a headline referencing violence in America in her closing slides and her allusion to the impact of violence on the community generally were improper appeals to the passion and prejudice of the jury. We disagree and find no error.

### 2.6.1. Additional Facts

As the prosecutor drew near the end of her argument, she reviewed the evidence of gang membership and gang violence relevant to the gang allegations. She then argued: "Just to bring this to a close, [the co-prosecutor] and I are prosecutors here in the State of California, and specifically here in Los Angeles. We work for the Los Angeles County District Attorney's Office. And

39

this is a community. Lots of communities that are tired of gun violence, tired of gang violence. I was looking at news headlines recently and I saw this headline (indicating). What a sad state. What a sad view of our community. And so, having heard the evidence in this case and having heard the law that applies, we are asking you to find the defendants—hold them accountable and find them guilty. Thank you all for your time."

The court dismissed the jurors for a 15-minute break. After the jury left the courtroom, defense counsel objected to a slide the prosecutor displayed during the closing portion of her argument that included a headline reading, "Niger's Government Asked the U.S. to Arm Its Drones. People Aren't Sure They Like the Idea. I Know America, You Can Be Shot in Broad Daylight." During an extended colloquy with counsel, the court repeatedly questioned the relevance of the headline to the case as it did not relate to MS-13 in particular or gang violence generally. Despite impassioned argument from counsel, the court overruled defendant's objections. After the jury returned to the courtroom, and at defendant's request, the prosecutor displayed the slide briefly while the court admonished the jury as follows: "There is a particular slide; it was utilized during the prosecutor's argument. It is irrelevant to the issues in this case, and I am instructing you to disregard the information from that slide." The court then directed the prosecutor to take the slide off the screen, which she did.

### 2.6.2. Analysis

We conclude that the prosecutor did not improperly appeal to the passion and prejudice of the jury.

First, as discussed above, to the extent that the article and the prosecutor's accompanying argument was a call to the jury to

act as the conscience of the community, the Supreme Court has upheld such arguments as proper. (*People v. Holmes, McClain and Newborn, supra*, 12 Cal.5th at p. 789.) " 'It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' " (*People v. Wharton* (1991) 53 Cal.3d 522, 567.) The prosecutor's comment about communities being tired of gun violence and gang violence relates to the widely acknowledged gang violence problem in Los Angeles, something surely within the general knowledge or common experience of jurors residing in this city.

Second, with respect to the headline, the jury was instructed to disregard the offending slide because it was irrelevant. We presume the jury followed these instructions. (See, e.g., *Avila, supra*, 46 Cal.4th at p. 719.)

Third, the prosecutor's reference to the impact of violence on the community and her display of the headline were brief and unlikely to have influenced the jury to a significant degree. The transcript suggests that the comments and display of the headline lasted less than 30 seconds. Additionally, the statements about community violence were de minimis. The prosecutor's lengthy closing argument focused on the evidence and the charges. The portion to which defendant objects comprises approximately one–half of one page in the transcript. (See *People v. Anderson* (2018) 5 Cal.5th 372, 415 [noting that "[t]o the extent the prosecutor's language, 'I believe with all my heart,' could be viewed as invoking his personal prestige or depth of experience, the brief remark could not have been prejudicial"].)

Finally, even if the prosecutor's brief commentary was improper, there is no reasonable likelihood that the result would

have been different. (*People v. Ayala* (2000) 24 Cal.4th 243, 288.) Substantial evidence supports the jury's verdicts and it is unlikely that the jurors would have focused on the headline, given that even the court struggled to understand the connection between the headline (relating to the use of armed drones in Niger) and the case before it. Further, as discussed above, the jury was instructed that the attorney's statements were not evidence. We presume the jury heeded this admonition. (*People v. Morales* (2021) 5 Cal.4th 34, 47.)

### 2.7. Cumulative Effect

"Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) Garcia argues that the cumulative prejudicial effect of the errors he has raised on appeal require reversal of the attempted murder convictions and special allegations.

We conclude that any errors that did occur, whether viewed singly or in combination, are insufficient to warrant reversal of Garcia's convictions. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1056; *People v. Pride* (1992) 3 Cal.4th 195, 269.)

### 3. AB 333's amendments to section 186.22 apply retroactively and require reversal of the gang and gang-related firearm enhancements.

Effective January 1, 2022, AB 333 "amends section 186.22 to require proof of additional elements to establish a gang enhancement." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343.) Specifically, AB 333 narrows the definition of " ' "criminal street gang" ' " to " 'an[y] *ongoing organization, association, or group* of three or more persons, whether formal or informal, having as one

of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity.' [Citation.]" (*Lopez*, at p. 344.)

AB 333 also "redefines 'pattern of criminal gang activity' to require that the last of the predicate offenses 'occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed,' and that the predicate offenses 'were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offenses is more than reputational.' [Citation.]" (*People v. Lopez*, *supra*, 73 Cal.App.5th at p. 345.) "In addition, the currently charged offense cannot be used as a predicate offense under the amendments" made by AB 333. (*Ibid*.)

Garcia contends, and the Attorney General agrees, that AB 333's amendments to section 186.22 are retroactive to non-final judgments. The Attorney General also concedes that the proof offered at trial does not satisfy the requirements of AB 333. The prosecution relied on Gonzalez's conviction for his participation in Jurado's murder, one of the currently charged crimes, as a predicate offense to establish a pattern of criminal activity. Under section 186.22, subdivision (e)(2), that conviction can no longer be used as a predicate offense for proof of the "pattern of gang activity" required for a true finding on the enhancement. The Attorney General agrees with Garcia that there was no evidence that the prosecution's other predicate offense commonly benefited a criminal street gang in a way that was more than reputational. Finally, the Attorney General concedes that the

43

gang-related firearm allegations found true in connection with the gang enhancements must also be vacated for insufficient evidence. (§ 12022.53, subd. (e)(1).)

We accept these concessions. "We therefore conclude that the gang-related enhancement findings must be vacated and the matter remanded to give the People the opportunity to prove the applicability of the enhancements under the amendments to section 186.22." (*People v. Lopez, supra*, 73 Cal.App.5th at p. 346.) We also vacate the section 12022.53, subdivision (e) gang-related firearm enhancements. The allegations underlying those enhancements may be retried on remand. (See *People v. Sek* (2022) 74 Cal.App.5th 657, 669.)[9]

### 4.    Garcia was not prejudiced by any failure to bifurcate the gang allegations.

AB 333 also added section 1109, which requires that, if requested by the defense, a gang enhancement charged under section 186.22, subdivision (d) must be tried separately and only after a defendant's guilt of the underlying offense has been established. Garcia contends that newly enacted section 1109 should be also applied retroactively and requires that we reverse the judgment in its entirety. The Attorney General argues that, in *In re Estrada* (1965) 63 Cal.2d 740, the California Supreme

---

[9] Garcia also argued that the jury verdict and the abstract of judgment incorrectly listed the gang enhancement alleged in connection with the criminal threats charge as being pursuant to section 186.22, subdivision (b)(1)(C), rather than subdivision (b)(1)(B). Although the court correctly imposed the lesser five year sentence pursuant to subdivision (b)(1)(B), Garcia asked that the abstract of judgment be corrected to reflect an enhancement pursuant to subdivision (b)(1)(B). Because the gang enhancements must be vacated, this request is moot.

Court held that, absent evidence to the contrary, the Legislature intends amendments to statutes that reduce criminal punishment to apply to all cases not yet final on the amendments' operative date. Because section 1109 governs only trial procedure and does not alter the substantive requirements of the gang enhancement, the Attorney General argues that it does not implicate the presumption of retroactivity set forth in *Estrada* and applies prospectively only.

"The question of whether section 1109 applies retroactively is the subject of a split of authority among the Courts of Appeal." (*People v. Tran* (2022) 13 Cal.5th 1169, 1239.) This Division is among those that have held that section 1109 applies prospectively only. (See *People v. Perez* (2022) 78 Cal.App.5th 192, 207.) However, the Supreme Court expressly declined to resolve the split of authority in *Tran* because "any asserted error in failing to bifurcate was harmless." (*Tran*, at p. 1239.)

We need not address the retroactivity of section 1109 here because, even assuming it applies retroactively, it is not reasonably probable that Garcia was prejudiced by any failure to bifurcate the gang allegations. (See *People v. Tran, supra*, 13 Cal.5th at p. 1240 [applying the *People v. Watson* (1956) 46 Cal.2d 818 standard for state-law error].) Gang evidence in this case was highly relevant to the issues of motive and intent. "[N]othing in Assembly Bill [No.] 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges." (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132.) Much of the gang evidence would have been properly admitted, even in a bifurcated proceeding, given its relevance to the substantive charges. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049–1050 [gang

45

evidence often relevant to and admissible regarding the charged offense]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167–1168 [gang evidence is relevant and admissible when the motive is gang related; evidence related to gang membership not insulated from general rules applicable to relevant evidence].) In addition, the jury was instructed as to the limited purposes for which it could consider the gang evidence, and we presume the jury followed that instruction. (*People v. Franklin* (2016) 248 Cal.App.4th 938, 953.)

We conclude the failure to bifurcate the gang allegations was not prejudicial and does not require reversal of the judgment in its entirety. We also conclude that the failure to bifurcate did not violate Garcia's federal constitutional right to due process, which would require us to determine whether the claimed error was harmless beyond a reasonable doubt under *Chapman v. California*, *supra*, 386 U.S. 18. Accordingly, any error in failing to bifurcate the allegations was harmless.

## DISPOSITION

The true findings on the gang and gang-related firearm allegations under section 186.22 and section 12022.53, subdivision (e), are reversed and Garcia's sentence is vacated. The matter is remanded to provide the People an opportunity to retry the allegations under the law as amended by Assembly Bill No. 333. At the conclusion of any retrial on remand, or if the People elect not to retry the allegations, the court shall resentence Garcia in a manner consistent with this opinion. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.